IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JEFFREY R. BRAUN, | ) | CASE NO. 1:11-CV-00886 |
| | ) | |
| Petitioner, | ) | JUDGE DONALD C. NUGENT |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| DONALD MORGAN, WARDEN | ) | |
| | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Respondent. | ) | |

Petitioner, Jeffrey R. Braun, filed this habeas corpus action pursuant to 28 U.S.C. § 2254 on May 4, 2011.  Doc. 1.  Braun challenges the constitutionality of his conviction and sentence in *State of Ohio v. Jeffrey Braun,* Case No. 2007CR496324 (Cuyahoga County).  In that case, a jury found Braun guilty of aggravated murder with the capital specification that the murder was committed in the course of an aggravated robbery with firearm specifications; aggravated robbery with firearm specifications; tampering with evidence; and having a weapon while under a disability.  Doc. 12-1, pp. 233-234[1].  The trial court sentenced Braun to life in prison without the possibility of parole.  Doc. 12-1, p. 234.

On December 14, 2012, Braun filed an amended petition for writ of habeas corpus, setting forth five grounds for relief:

> **Ground One:**  The state improperly and unconstitutionally withheld exculpatory and/or impeachment evidence from Mr. Braun in violation of its obligations under *Brady* and the Due Process Clause of the Fifth Amendment.

> **Ground Two**:  Mr. Braun's constitutional right to a fair trial under the Due Process Clause was violated.

> **Ground Three**:  Mr. Braun was provided ineffective assistance of counsel at trial in violation of the Sixth Amendment.

---

[1] Page citations correspond to ECF page numbers at the top of the page.

**Ground Four**:  The trial court violated Mr. Braun's constitutional right to confrontation under the Sixth Amendment.

**Ground Five**:  The verdict is not supported by sufficient evidence.

**Ground Six:**  Braun also asserts one claim for relief "arising from constitutional errors in his post-trial proceedings."[2]

Doc. 47, pp. 14-107.  This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2.  For the reasons set forth below, the undersigned recommends that Braun's amended petition for writ of habeas corpus (Doc. 47) be **DENIED**.

## I.  Factual Background

In a habeas corpus proceeding instituted by a person in custody pursuant to the judgment of a state court, the state court's factual findings are presumed correct. 28 U.S.C. § 2254(e)(1). The petitioner has the burden of rebutting that presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *see also Railey v. Webb*, 540 F. 3d 393, 397 (6th Cir. 2008), *cert. denied*, 129 S. Ct. 2878 (2009). The Cuyahoga County Court of Appeals, Eighth Appellate District of Ohio set forth the facts underlying Braun's conviction as follows:[3]

{¶ 2} On October 25, 2005, John Chappell, a.k.a. "Pook" (hereinafter "the victim" or "Pook"), died from two gunshot wounds to the head. He was found next to an abandoned house at 3302 W. 17th Street, Cleveland, Ohio, in a burning Chevy Blazer. It was close to midnight. When the firefighters arrived, it was clear that the victim was already dead.

---

[2] Braun does not list this as an enumerated Ground, however, for purposes of this report it will be referred to as Ground Six.

[3] The facts are taken from the Eighth District Court of Appeals' July 22, 2009, decision. *State of Ohio v Jeffrey Braun*, 2009 WL 2963759 (8th Dist. 2009).  Braun has not demonstrated by clear and convincing evidence that the state court's factual findings were incorrect.  Accordingly, the state court's findings are presumed correct.  *See* 28 U.S.C. § 2254(e)(1); *see also Railey v. Webb*, 540 F. 3d at 397.

The point of origin of the fire was the floor of the front passenger compartment, where the victim's feet were located.

{¶ 3} The coroner testified that the victim bled to death from the gunshot wounds. He also testified that there was a 9 percent level of carbon monoxide in the victim's blood and that the carbon monoxide finding may indicate that the victim inhaled burning materials while he was bleeding to death, but the coroner could not say with certainty that the victim was alive at the time of the fire.

{¶ 4} At trial, Tracy Walsh testified that she lived at a house on West Boulevard that people used as a "dope house," a place where people smoked crack. She said that the victim had been "staying" at her place prior to his murder. She testified that the victim was a drug dealer who provided drugs to her in exchange for the use of her 2001 Chevy Blazer. The day of the murder, the victim was at Tracy's house. When the victim took a shower, Tracy answered his cell phone. She testified that Braun, a.k.a. J.B. (hereinafter "Braun" or "J.B."), asked, "Is Pook there?" When she said, "hey, J.B., what's up?" Braun hung up. When the victim got out of the shower, Tracy told him that Braun had called. Tracy remembered that the victim was frantically looking for his set of keys to her vehicle. The victim left in Tracy Walsh's Blazer. She was under the impression that Pook was bringing gas to Braun because he had run out of gas…

{¶ 8} Shannon Holbert, one of Braun's ex-girlfriends, testified that on the night of the murder she was at a motel in Lakewood "getting high." The next morning, Shannon left the motel and started calling the victim because she wanted to buy more drugs to get high again. She testified that she called the victim's cell phone several times. She then heard from another drug dealer that Pook had been murdered. She testified that she was walking on Storer Avenue and was hysterical and crying over what she heard because Pook was her friend and "sex partner." She testified that she saw Braun drive up in a red car and that he asked her to get into the car. She testified that she asked Braun, "did you kill him? Did you kill Pook?" Braun said, "I killed that n* * *er." She said she then ran away.

{¶ 9} Renita Whitfield testified that she lives two doors down from the alley where the body was discovered. On the night of the murder, she was out on the front porch barbecuing with her husband, sometime between 7 p.m. and 11 p.m. She said that it was dark outside and she heard two male voices arguing in the alley. She said she went inside and then came back out and saw smoke. Soon everyone was outside watching the fire and the firefighters work.

{¶ 10} Michael Graham testified that on the night of Pook's murder, he went with Roy Fitzer and Jeremy Payne to steal a snow blower from Home Depot. After stealing it, they then sold it for $100 worth of crack cocaine and $50 cash. They then went to Dave Essenberg's house at 3444 Storer Avenue to get high, and Braun and Shear were at the house "acting anxious." Braun and Shear kept "pressing" for someone to go buy them gasoline, because their car was out of gas. Graham testified that he, Roy Fitzer, Frank Lewis, and Dave Essenberg walked up to the Dairy Mart on Fulton Road to get gasoline

for Braun and Shear and to buy beer. Graham stated that he bought the gas because they kept pressing him and because he did not want to share his drugs with them.

{¶ 11} Graham testified that when they returned with the gasoline, he set the container on the side of the house and went inside and told Braun and Shear the gas was outside. He said that Braun and Shear were in a hurry and anxious to get out of there. They grabbed the gasoline and left.

{¶ 12} Graham testified that he and his buddies then got high. When they ran out of drugs, Graham went to buy more. He went outside to get in the car he had earlier stolen, but it was gone; he thought Braun and Shear had taken it. Graham was mad, so he and Roy Fitzer walked back to the alley where Braun and Shear's vehicle, a black Chevrolet Camaro (sic) IROC-Z, was parked, and they stole the radio out of it to sell for drugs. While Graham was removing the radio, he and Roy Fitzer saw a set of headlights turn down the alley. They saw Braun driving Pook's Blazer and Shear following behind in Graham's stolen vehicle. Graham testified that Braun and Shear "flipped them off."

{¶ 13} After they passed, Graham got the radio out and tried to sell it for drugs. Eventually, he went back to Essenberg's house to smoke more crack. He watched the news, which reported that there was a car fire with a woman inside. After the news, Braun called looking for Shear. Graham asked where his stolen car was, and Braun said that he would get it back within a half hour. Braun called again an hour later looking for Shear.

{¶ 14} Graham testified that at some point the next morning, he went outside and noticed that the car he stole had been returned. While he was outside, Shear stopped over and wanted to smoke crack with Graham, so they smoked crack together. Shear offered Graham $40 to steal a car for him. Shear and Graham got into Graham's stolen vehicle and went searching for a car to steal. Graham testified that Shear went into the back alley and got a gun from a car parked in the yard of Bobby Fitzer, Roy Fitzer's twin brother.

{¶ 15} Graham asked Shear if he had anything to do with the girl in the car. Shear said it wasn't a girl, it was Pook. He said that they got into an argument over drugs, Pook was shot, and then they burned him with the gas. Graham said he and Shear continued to drive around looking for a car to steal. Graham found a car to steal, stole the car, got his money, and then went back to Essenberg's house.

{¶ 16} At the house, Graham told Essenberg what Shear had said. Essenberg laughed. Graham got some heroin and went to sleep.

{¶ 17} Graham testified that a day or two later, Roy Fitzer and Braun were riding around getting high and that they stopped at Essenberg's house. Essenberg and Braun started arguing. During the argument, Graham heard Braun say that if it came down to it, he would tell on Shear. Braun was also bragging about how many times he had been to court and won. Essenberg was laughing. Braun told Essenberg that he should shoot him like he shot Pook. Shear pulled up, and Braun told Shear that they had better do something about

Essenberg because "he was gonna get them knocked" for "running his mouth too much." Braun said that maybe they should shoot him. Braun then left with Roy Fitzer.

{¶ 18} Graham testified that while he was in prison at Lake Erie Correctional Institution, he was transported back to Cuyahoga County to make a statement to the Cleveland homicide detectives regarding the murder of John Chappell. A month after Graham was returned to prison, Shear was brought to Lake Erie Correctional Institution. Graham requested protective custody because he had made a statement against Shear. Graham heard Shear say, "I wouldn't play you like that." When Graham got out of "the hole,"[4] he was attacked. Graham was then moved to a different prison.

{¶ 19} Sandy Seidenwand, a.k.a. Sandy Shear, the mother of the codefendant Shear, was called as a court's witness. She testified that she had no idea that her son had a cell phone registered in her name. She also testified that she gave her son addresses of people while he was in prison and that she tried to investigate the case herself. Taped telephone conversations between Shear and his mother while Shear was in prison were played for the jury.[5]

{¶ 20} Cuyahoga County Corrections Officer George Metz testified that one day when he was transporting Braun back to his pod,[6] Braun saw Frank Lewis and yelled, "You're a f* * *ing snitch, a b* * * * who better shut up." Braun also said, "I got something for all you snitching b* * * *es."

{¶ 21} Daniel Quarrick testified that around Halloween 2005, he ran into Braun at Martin's Deli on West 25th Street. Quarrick said Braun was selling chains (necklaces). Quarrick looked at the chains, some of which appeared to be broken. Quarrick testified that he got into Braun's "dirty" (stolen) car, and they went back to Quarrick's house to get money so he could buy one of the chains. When they got back to Quarrick's house, Quarrick noticed that his girlfriend had left with his money, so Quarrick could not buy the chain. He testified that Braun wanted money or cocaine, but Quarrick had only heroin. He also testified that Braun showed him a revolver while they were in the car together. The next day, Quarrick said he was delivering heroin and making some "buys" when he ran into Shear. Shear had a .380 automatic pistol with him.

{¶ 22} Quarrick testified that a few months later, he ended up in Cuyahoga County jail. Shear was in the same pod as Quarrick and was bragging to him about Pook's death. Shear told him that he and Braun called the victim to get some drugs and to set up a robbery. They robbed, killed, and "burned him up." Shear went on to say they saw Pook in an alley, Braun robbed him, and Pook started getting loud, so Braun shot him. Shear said he didn't think it was going to happen like that; it was supposed to be just a robbery.

---

[4] The segregation unit is known as "the hole."

[5] The audiotapes were not sent to the court of appeals.

[6] In the county jail, a "pod" is a unit of cells that typically holds 29 inmates.  The cells surround a day area where there are tables, telephones, and a television.  Inmates spend time in lock down and time in the day area.

Shear said he didn't want to leave the situation with Pook and the blood in the Blazer, so he helped Braun dispose of Pook.

{¶ 23} After hearing this, Quarrick wrote a letter to Detective Sweeney of the Cleveland Police Department First District telling him that he had information regarding the murder of Pook. Eventually, Quarrick made a statement to police. Quarrick then received a letter from Shear telling him to tell the homicide detectives that his statement was a lie. Quarrick testified that Shear tried to "detour" him from testifying. He testified that he was receiving threats.

{¶ 24} Angela Casto, Shear's ex-girlfriend, testified that Shear spoke with her and asked her to be a witness in his case and to say she was with him the night Pook died. Shear blamed Braun for the murder, but said that he helped Braun get rid of the body. Angela Casto refused to be his alibi. Angela also testified that she notified the homicide detectives about letters written by Braun to Shear while in prison. The letters were picked up by the police.

{¶ 25} Kimberly Ferline, Braun's ex-girlfriend, testified that Braun asked her to be his alibi for the night of Pook's murder. He asked her to say that they had a spaghetti dinner together. At first she agreed, but then she changed her mind.

{¶ 26} Kimberly Ferline said that Braun also asked her to go to Kelly Mechling's house to see if the gun still was on top of the garage. Braun told her to throw the gun into the lake. Kimberly went to the house, squeezed between the garage and a tree, and was able to reach the top of the garage by standing on some debris. She checked the roof and the gutter and did not find the gun. She told Braun she didn't find it, and he said that Shear must have gotten it.

{¶ 27} Detective Henry Veverka of the Cleveland Police Department Homicide Unit testified about his investigation into John Chappell's murder. He testified that at the beginning of the investigation, all he had to work with were the nicknames of the victim (Pook) and of the suspects (Cheese and J.B.). On October 30, 2005, Det. Veverka learned that Braun, Roy Fitzer, and John Shear were wanted in connection with the robbery and attempted murder of Tom McDonald. From this report, he was able to connect Braun and Shear to the nicknames J.B. and Cheese, and put together a photo array for Tracy Walsh. She identified Braun as J.B. and Shear as Cheese. Det. Veverka testified that there were approximately seven phone calls made to Pook's cell phone between 9:30 and 10:45 p.m. from Shear on the night of the murder.

{¶ 28} On November 1, 2005, Braun and Roy Fitzer were arrested for robbery and the attempted murder of Tom McDonald. Det. Veverka and his partner, Det. James Metzler, interviewed both individuals in connection with Pook's murder. Pook had still not been positively identified as John Chappell. Det. Veverka testified that Braun was read his rights and agreed to talk to them without an attorney present. Braun said he did not know anything about Pook's death, but that he had heard he was the last to see him. He knew Pook from the neighborhood and had bought drugs from him in the past. He gave the

detectives Pook's cell phone number. Braun said that both he and Pook had stayed at Tracy Walsh's house for a few days, along with several other people. Braun said that he was at Kelly Mechling's house when he learned about Pook's death from Tyrone Harvey. He said he did not see Pook on the night of his murder, but that he did call Pook around four or five o'clock to ask him for gasoline. Braun said that on the night of the murder, he was riding around with a male he knew only by the name of "Cheese." He said they ran out of gas on Denison Avenue, so he and Cheese went to Athens Pizza on West 88th Street and Denison Avenue, ordered a pizza, and called Pook for gas. Braun said he borrowed a cell phone from a guy behind the counter to call Pook.

{¶ 29} Braun told the detectives that they waited a half hour for Pook and then Braun called him again to ask Pook where he was. Pook told him that he forgot, so Braun told him "never mind we have the gas." Braun said Cheese left and got some gas, but he did not know how. First Braun told the detectives that they drove to Kelly Mechling's house and spent the night. Then he told detectives that they dropped the car off at some female's house and walked to Kelly Mechling's house around 7:00 or 8:00 p.m…

{¶ 32} Det. Veverka testified that he received letters from an inmate by the name of Matthew Stedman, who claimed that Braun had admitted to numerous criminal acts, including the murder of Pook. Stedman was interviewed, and a statement was taken.

{¶ 33} On February 14, 2006, Braun called the detectives from county jail and told them that he wanted to speak with them again. Braun made a second statement. He said that he had nothing to do with Pook's murder. He said he saw the statement Roy Fitzer had given wherein he told the police that Braun gave him a gun "with a body on it," meaning it had been used in a murder. Braun said that he had been hanging out with Shear for about three days before Pook was killed and that they were getting high and "hitting licks" on Denison Avenue. He explained that they were taking "dope" from "dope boys" and not paying for it.

{¶ 34} Braun said that on the day of the murder, he was with Shear and they were "tricking some dope boys out of their drugs." He said they ran out of gas somewhere in the industrial area by Almira Avenue. He said they walked to Athens Pizza, ordered a pizza, and called Pook for gas. Braun said after waiting for a while, he went across the street to the deli and called Pook again. He said that Shear pulled up, they got their pizza and went to Kelly Mechling's house to smoke some dope. Cheese then took Braun to his girlfriend Kimberly Ferline's house. She had made him a spaghetti dinner, they had some friends over, played spades, and smoked crack.

{¶ 35} Braun told detectives that at about 10:00 to 10:30 that evening, Cheese showed up and was acting really nervous and had a "bunch of crack." Braun said he went with Shear to Kelly Mechling's house, smoked some more crack, and passed out at Kelly's. The next morning he heard from some unknown female that Pook had been killed.

{¶ 36} Matthew Stedman testified that he was currently serving time for aggravated murder and attempted arson. He testified that in November 2005 he was transferred back

to Cuyahoga County jail for a post conviction motion hearing. While in county jail, he was in the same pod as Braun. He testified that Braun approached him because he recognized him from 2001 when they had served time in Ross Correctional Institution. Stedman testified that Braun started telling him that he was under indictment for aggravated robbery, aggravated burglary, and attempted murder, and that he was a person of interest in two other homicide cases. Braun told him about using crack cocaine and robbing drug dealers, home invasions, and different things that he did to support his habit and make money.

{¶ 37} Stedman testified that Braun gave details about the case he was arrested on, as well as Pook's murder. Braun told him that he set up Pook by calling him and telling him that his car had run out of gas and asked him to bring him some gas. He said that when Pook showed up, he killed him. Braun said that he and Shear dragged Pook's body back to the truck, poured gas all over him and the truck, and set it on fire. Braun told Stedman that he used the same gun that was used in the Tom McDonald case to kill Pook. He said it was a .38. He said Roy Fitzer was the last to use the gun.

{¶ 38} Braun told Stedman that Shear had fled the state to avoid being indicted for the homicide. He also told Stedman that he had set up an alibi for Pook's murder. He explained that he went to a pizza place, called Pook for gas, and then ordered a pizza and had it delivered to his car so that the delivery person could see him and be his alibi for the time of Pook's death. Braun also told him that he was going to use his girlfriend and some other "upstanding citizens" to claim he was with them at the time of the crime.

{¶ 39} Braun told Stedman that he could not be indicted for capital murder because they did not know that a robbery had occurred. Braun continued to brag and laugh about Pook's murder and the Tom McDonald robbery.

{¶ 40} Braun asked Stedman to help him draft a motion to marry his girlfriend, Kimberly Ferline. Braun was under the impression that if he married her, she could not testify against him in trial. Braun also told Stedman that if he ever testified against him, Braun would have him killed.

{¶ 41} Stedman testified that Braun said that he should be applauded for killing Pook because Pook was a drug dealer and Braun did society a favor. Braun told Stedman to tell Shear, when he saw him, to shut his mouth about the murder. Stedman relayed the message to Shear.

{¶ 42} Stedman kept a written journal of all the conversations he had with Braun and then sent them to the prosecutor's office, asking for consideration in his own case. Stedman was told no.

{¶ 43} When Braun found out that Stedman was to testify against him in the Tom McDonald case, Braun shouted through the bars "You f* * *ed up, you f* * *ed up, you messed with the wrong guy. You're dead, you're f* * *ing dead, I'm going to get you."

{¶ 44} Tom McDonald testified that he sold drugs and that on October 29, 2005, Braun and Roy Fitzer broke down his door and robbed him. He testified that Braun hit him over the head with a golf club and Roy Fitzer shot him three times. McDonald testified that after he was shot, Braun went through his pockets and took his money. He said the money was still on fire because the bullet had gone through the money. Braun asked him where the dope was, but McDonald did not tell him. McDonald testified that he was shot with a .38. He said that one bullet was still lodged in his spine, and another was fused to the bones in his ankle. One bullet went through his thigh and was found lodged in a kitchen cabinet.

{¶ 45} Keith Martin from Revol Wireless testified regarding the logistics of outgoing and incoming calls for cellular phones, the location and function of cell towers in Cleveland, and the data contained in account history documents. Martin explained that there were more than 300 Revol wireless towers in the city and that each tower's radius is typically one mile. When an individual "sends" a call, it is picked up by the cell tower, transported across local lines (telephone lines), and is sent to the tower closest to the person receiving the call. If the sender or the receiver of the call is in motion, most likely the cell will hit different towers.

{¶ 46} Martin testified regarding the accounts of Sandy Shear (a.k.a.Seidenwand) and Elizabeth Arcuri. The cell phone number assigned to Sandy Shear's account was the cell phone number known to be used by the co-defendant Shear. The cell phone number assigned to Elizabeth Arcuri's account was used by the victim.[7]

{¶ 47} The account history showed numerous cell phone calls from Shear to the victim throughout the day and night of the murder. According to the records, prior to Shear's call, the victim was located near cell phone tower 25, which is the tower near Tracy Walsh's house. Shear called six times that night (9:08, 9:46, 10:15, 10:22, 10:26, 10:36) while the victim was near tower 25. The history indicates that the victim's cell phone then traveled near cell tower 178, located on Lorain Avenue, then west to tower 30 on Train Avenue, and then west to tower 154 on Fulton Avenue. The records show that at 10:45 p.m., Shear called the victim, and both cell phones were at tower 30. Shear made one more call to the victim's cell phone at 10:58 p.m., near cell tower 42 at 3445 West 17th Street. The records indicate that by that time, the victim's cell was off, out of the area, or damaged. The victim's body was found at 3302 West 17th Street near cell tower 42.

{¶ 48} Nicholas Mavorois testified for the defense. He verified his cell phone number, which records show was used to call the victim on the day of the murder at 4:26 p.m. He testified that he owns two Athens Pizza stores, one on Denison Avenue and one on Rocky River Drive. He testified that he sometimes lets customers use his cell phone rather than the business phone. He did not know or remember Braun.

{¶ 49} Linda Houli testified for the defense. She testified that she owns Linda's Deli at 8708 Denison Avenue. She verified her business number, which appeared on the victim's account summary. At 4:59 p.m., someone used her business phone to call the victim on

---

[7] Arcuri testified that she let the victim open up and use a cell phone account in her name.

the day of his murder. She testified that she lets customers use the business phone. She testified that she did not know or remember Braun.

{¶ 50} Kelly Mechling testified for the defense. She testified that she lived at 3317 Trowbridge and that on the night of the murder Braun and Shear were at her house celebrating her friend Dana Sanders's birthday. She testified that she went to sleep next to Shear at approximately 10:30 p.m. Shear had already passed out. She testified that Braun was there, smoking crack with two females, Dana and Sheryl, when she fell asleep. Kelly testified that she and Shear woke up around 8:00 to 8:30 in the morning and that Braun and the girls were still smoking crack. She testified that they were at her house when they saw the news about the victim's death.

{¶ 51} On cross-examination, Kelly Mechling admitted that she did not remember the night of the murder, but was reminded by the defense's investigator that "Braun said it was the night of Dana's birthday party." The defense's investigator spoke with her in December 2007, more than two years after the murder. Kelly was adamant that she remembered when she went to bed the night of Dana's birthday. Kelly admitted that she did not know the date of Dana's birthday. In addition, in her statement to police a few weeks after the murder, she denied that Braun and Shear were at her house on the night of the murder or the day after. Kelly insisted that she didn't know dates, but she remembered Dana saying it was her birthday and that they were "partying" (smoking crack) because of it.

{¶ 52} Thomas Rea testified for the defense. He was the investigator for Braun. He acknowledged that when he spoke to Kelly, he asked her if she remembered the night of Dana's birthday party. He admitted that Braun told him to remind her that Pook was murdered on the same night as Dana's birthday.

{¶ 53} Corrections Officer Adam Broeckel testified for the defense. He stated that he was escorting Braun back to his pod when another inmate, Frank Lewis, waved to Braun. CO Broeckel testified that Braun got upset and screamed "don't wave to me. You're trying to kill me." Braun told the CO that Lewis was testifying against him.

{¶ 54} Dana Sanders Newberry testified for the defense. She testified that her date of birth is October 25, 1972, and that in 2005 she celebrated her birthday with her mother at a bar and later at Kelly Mechling's house on Trowbridge Avenue. She said that she called Robert Mechling, a.k.a. Uncle Bob, Kelly's brother and Tracy's ex-husband, who told her to come over because they were partying at his sister's house and he had a present for her. She went over there around ten or eleven and "kicked it all night." She testified that when she got there, she was already drunk because she had been drinking with her mother since 8:00 p.m. She said that when she arrived, Cheese was already asleep and so was Kelly. She testified that it was the first time she had met J.B. and Cheese. She said she hung out with J.B., getting to know him. She said they drank, smoked crack, and "had sex." She stayed at Kelly's all night and part of the morning with J.B.

{¶ 55} On cross-examination Dana testified that she had not spoken to Braun since that night, but heard he was in jail. She stated that in December 2007, the defense investigator met with her and spoke about her birthday in 2005. She admitted that Braun wrote her sister-in-law a letter, but she denied reading it (because she cannot read) and denied that her sister-in-law told her what the letter said.

{¶ 56} Braun took the stand in his defense. He admitted to being a convicted felon and spending most of his adult life in prison. He testified that he carried a .380 automatic. He admitted to robbing drug dealers and taking money, drugs, guns, and jewelry from them. He denied talking to Stedman. He denied seeing Shannon Holbert the day after Pook's murder. He insisted that Holbert was lying because he never steals red cars because "the color red is a beacon, you know what I mean, it's a dangerous color," "too many people notice red cars." He denied asking Kimberly Ferline to be his alibi and asking her to get rid of the gun. He denied attempting to sell chains to Daniel Quarrick. He denied any involvement in the Tom McDonald robbery, other than being present. He denied killing Pook.

{¶ 57} Braun testified that on October 25, 2005, he and Shear were driving around in a stolen IROC getting high and "hitting licks," meaning robbing drug dealers. He said they rode up and down Denison Avenue near W. 80th and W. 90th Streets looking for drug dealers to rob when they ran out of gas. He and Shear walked up to Athens Pizza to call someone to bring them gas. Braun said that neither of them had a cell phone. Braun testified that he asked the guy behind the counter to call Pook to bring them gas. Braun said they waited for about a half hour. They ordered a pizza, and then Shear decided to leave; Braun thought Shear was going to steal another car. Braun walked across the street to the deli to buy a beer and call Pook again. He said he called Pook and asked him where he was, and Pook said he was looking for a gas can. Braun said he walked back across the street to the pizza place and saw Shear pull up in the IROC. Shear told him that he had gone and got gas. They got their pizza, ate it in the car, and then headed toward Lorain Avenue.

{¶ 58} While they were driving, Braun saw a drug deal "go down," so he told Shear to pull over. Braun got out and robbed the drug dealer of approximately an ounce of crack cocaine, $2,000, a .40 caliber gun, and jewelry (chains). Braun jumped back in the car, and Shear drove away. They went to Bob Fitzer's house and smoked some crack.

{¶ 59} Braun testified that he left Shear there and walked to Kelly Mechling's house. He said it was about 5 or 6 p.m. He said her grandkids were there, so he went to Kim Ferline's. Kim was yelling at him because he was never around. Braun testified that they smoked a little, and then he left to go back to Kelly Mechling's to get high for the night.

{¶ 60} Braun testified that he sent Kelly's brother, Uncle Bob, who lived in a camper in Kelly's backyard, to the store to buy crack pipes and beer. He testified that in the inner city, delis sell crack pipes, each disguised as a glass tube with a rose in it. He said that when Uncle Bob came back, Braun set out the crack on a plate and divided it up for everyone. Braun testified that a female named Dana came over and Uncle Bob said it was

11

her birthday, so Braun gave her some crack. Braun said between 10:00 and 11:00 p.m., Shear showed up; he was high and passed out on the bed. Kelly fell asleep next to him. He testified that Dana and he smoked crack, drank, and had sex all night. He testified that he didn't leave until late morning.

{¶ 61} Braun testified that a day or two later, he heard from Shear that Pook was dead and that people were saying Braun had killed him.

{¶ 62} On cross-examination, it was pointed out to Braun that Shear called Pook from his cell phone twice before they called from the pizza shop and the deli, but on direct Braun said neither of them had a phone. Braun said he didn't remember Shear calling Pook. Braun said that he might have called Pook from the Zenith Court alley to let him know that they got gas, because Shear found his cell phone under the seat of the IROC.

{¶ 63} Braun insisted that everyone was "lying on him." He stated that the prosecutor set it all up and told the witnesses what to say.

Doc. 12-1, Ex. 29, pp. 211-234.

## II. Procedural Background

### A.  State Conviction

Braun was found guilty, after a jury trial, of aggravated murder with the capital specification that the murder was committed in the course of an aggravated robbery with firearm specifications; aggravated robbery with firearm specifications; tampering with evidence; and having a weapon while under a disability.  Doc. 12-1, Ex. 29, p.233-234. After the mitigation phase, the jury returned a sentencing verdict of life imprisonment without the possibility of parole.  Doc. 12-1, Ex. 29, p.234.  February 12, 2008, the trial court sentenced Braun to life in prison without parole.  Id.

### B.  Direct Appeal

On March 10, 2008, Braun filed a Notice of Appeal to the Eighth District Court of Appeals of his conviction and sentence.  Doc. 12-1, Ex. 23, p.84.  In his Brief, he presented fifteen assignments of error:

**First Assignment of Error**: The state improperly, illegally and unconstitutionally withheld exculpatory and/or impeachment evidence from the defense in violation of the discovery rules and its obligations under *Brady v. Maryland.*

**Second Assignment of Error**: The trial court denied Braun's right to a fair trial and to the effective assistance of counsel when it denied Braun's request for a continuance that was made immediately after the state provided to him, moments before opening statements, with exculpatory evidence contained in statements the state had concealed for more than a year that Braun's co-defendant had admitted shooting the victim.

**Third Assignment of Error**: The state's failure to inform the defense of the existence of informant Matthew Stedman's 'journals' and letters, and to provide copies of those important documents to the defense prior to trial, denied Braun a fair trial, due process of law, and the effective assistance of counsel.

**Fourth Assignment of Error**: The trial court erred in denying Braun's request to order the prosecutor's file submitted for an in camera review by the trial court and sealed for appellate review by this court.

**Fifth Assignment of Error**: Because jailhouse informant Matthew Stedman's motive to fabricate evidence of Braun's guilt-i.e., his motive to secure from the state favorable consideration in his own pending criminal case-existed the moment Stedman began documenting for the state his alleged contemporaneous jailhouse conversations with Braun, as Stedman's own letters to the state confirm, the trial court violated Evid.R. 801(D)(1)(b) when it granted the state's improper request on redirect to admit into evidence Stedman's undisclosed, and highly prejudicial, 'journals' and letters as 'prior consistent statements' necessary to rebut an alleged defense charge of recent fabrication.

**Sixth Assignment of Error**: The trial court erred in permitting the introduction of evidence of 'other acts' of Jeffrey Braun, and in overruling various motions in limine, motions to strike, and motions for mistrial regarding 'other acts' evidence, thus violating Braun's Fourteenth Amendment rights to a fair trial and due process of law.

**Seventh Assignment of Error**: The trial court's admission of hearsay statements of alleged co-conspirator John Shear was in violation of Evid.R. 801(D)(2)(e) and Braun's constitutional right to confront the witnesses against him.

**Eighth Assignment of Error**: The trial court's failure to allow the defense to present evidence that another person had admitted to killing the victim deprived Braun of a fair trial and of his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

**Ninth Assignment of Error**: The trial court erred in admitting the bullet evidence allegedly from the Tom McDonald crime scene.

**Tenth Assignment of Error**: The trial court's arbitrary rulings that (1) Braun himself was not permitted to review any of the state witnesses' prior written statements, and (2) such statements could not be used by Braun's counsel in cross-examining a state witness without the entire written statement being submitted to the jury, denied Braun's confrontation rights, denied him the right to effective cross-examination, and interfered with his defense, in violation of his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and comparable provisions of the Ohio Constitution.

**Eleventh Assignment of Error**: Prosecutorial misconduct deprived Braun of his constitutionally guaranteed right to a fair trial, in violation of the Fifth and Fourteenth Amendments, to the United States Constitution and Section 10, Article I of the Ohio Constitution.

**Twelfth Assignment of Error**: The performance of trial counsel was deficient, and deprived Braun of the right to effective assistance of counsel guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and Section 10, Article I of the Ohio Constitution.

**Thirteenth Assignment of Error**: Braun's convictions are based on insufficient evidence and/or are against the manifest weight of the evidence, in violation of the Fifth and Fourteenth Amendments to the United States Constitution and Section 16, Article I of the Ohio Constitution.

**Fourteenth Assignment of Error**: Braun was denied his constitutional right to a fair trial by the cumulative effect of all the many and serious errors that occurred during his trial.

**Fifteenth Assignment of Error**: The trial court's sentencing judgment is defective because the sentences for all but the aggravated murder were not imposed in open court and are improperly consecutive.

Doc. 12-1, Ex. 24, pp.85-140.  On December 12, 2008, the State filed a responsive brief.  Doc.

12-1, Ex. 25, pp. 141-200.  On September 20, 2009, the Eighth District Court of Appeals issued

its opinion affirming the judgment of the trial court.  Doc. 12-1, Ex. 29, pp. 209-270.  The Court

also reversed sentencing and remanded the case to the trial court for resentencing.[8] Doc. 12-1,

Ex. 29, p. 270.  The trial court re-sentenced Braun to life in prison on December 7, 2009.  Doc.

12-1, Ex. 39, p. 394.

---

[8] The appellate court remanded Braun's case for resentencing because Braun was not present during the sentencing of all crimes.

On November 9, 2009, Braun filed a Notice of Appeal from the September 20, 2009, Eighth District Court of Appeals decision with the Ohio Supreme Court (Doc. 12-1, Ex. 30, pp. 271-273) and a Memorandum in Support of Jurisdiction wherein he presented the following fourteen propositions of law (Doc. 12-1, Ex. 31, pp. 274-496):

**Proposition of Law No. 1**: The State improperly withheld exculpatory and/or impeachment evidence from defense in violation of the discovery rule and its obligations under *Brady v. Maryland*.

**Proposition of Law No. 2**: The trial court denied Braun's right to a fair trial and to the effective assistance of counsel when it denied Braun's request for a continuance after the State had provided exculpatory evidence.

**Proposition of Law No. 3**: The State's failure to inform the defense of the existence of informant Matthew Stedman's "journals" and letters, and to provide copies of these important documents to the defense prior to trial, denied Braun a fair trial, due process of law, and effective assistance of counsel.

**Proposition of Law No. 4**: The trial court erred in denying Braun's request to order the Prosecutor's file submitted for an *in camera* review by the trial court and sealed for appellate review.

**Proposition of Law No. 5**: Because jailhouse informant Matthew Stedman's motive to fabricate evidence of Braun's guilt – i.e., his motive to secure from the State a favorable consideration in his own pending criminal case – existed the moment Stedman began documenting for the State his alleged contemporaneous jailhouse conversations with Braun, the trial court violated Evid. R. 801(D)(1)(b), and denied Braun Due Process and a Fair Trial, when it granted the State's improper request on redirect to admit into evidence Stedman's undisclosed, and highly prejudicial "journals" and letters a "prior consistent statements."

**Proposition of Law No. 6**: The trial court erred in permitting the introduction of evidence of "other acts" of Jeffrey Braun, and in overruling various motions in limine, motions to strike, and motions for mistrial regarding "other acts" evidence, thus violating Braun's Fourteenth Amendment rights to a fair trial and due process of law.

**Proposition of Law No. 7**: The trial court's admission of hearsay statements of alleged co-conspirator John Shear was in violations of Evid. R. 801(D)(2)(e) and Braun's constitutional right to confront the witnesses against him.

**Proposition of Law No. 8**: The trial court's failure to allow the defense to present evidence that another person had admitted to killing the victim deprived

15

Braun of a fair trial and of his rights under the Fifth, Sixth, Eighth, and Fourteenth
Amendments to the United States Constitution.

**Proposition of Law No. 9**:  The trial court erred in admitting the bullet evidence
allegedly recovered from the Tom McDonald crime scene.

**Proposition of Law No. 10**:  The trial court's arbitrary rulings that (1) Braun
himself was not permitted to review any of the State Witnesses' prior written
statements, and (2) such statements could not be used by Braun's counsel in
cross-examining a State's witness without the entire written statement being
submitted to the jury, denied Braun's Confrontation Rights, denied him the right
to effective cross-examination, and interfered with his defense, in violation of his
rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United
States Constitution and comparable provisions of the Ohio Constitution.

**Proposition of Law No. 11**:  Prosecutorial misconduct deprived Braun of his
constitutionally guaranteed right to a fair trial, in violation of the Fifth and
Fourteenth Amendments to the United States Constitution and Section 10, Article
1 of the Ohio Constitution.

**Proposition of Law No. 12**:  The performance of trial counsel was deficient, and
deprived Braun of the right to effective assistance of counsel guaranteed by the
Sixth and Fourteenth Amendments to the United States Constitution and Section
16, Article I of the Ohio Constitution.

**Proposition of Law No. 13**:  Braun's convictions are based on insufficient
evidence in violation of the Fifth and Fourteenth Amendments to the United
States Constitution and Section 16, Article I of the Ohio Constitution.

**Proposition of Law No. 14**:  Braun was denied his constitutional right to a fair
trial by the cumulative effect of all of the many and serious errors that occurred
during his trial.

On February 10, 2010, the Ohio Supreme Court declined jurisdiction to hear Braun's case and

dismissed the appeal as one not involving any substantial constitutional question.  Doc 12-1, Ex.

32, p.358.

### C.  Motion for new trial

While Braun's appeal was pending before the Eighth District, he filed a motion for new trial based on an affidavit of Roy Fitzer, in which Fitzer admitted to killing Chappell.[9] Doc. 12-1, Ex. 34, pp. 367-377.  On February 9, 2010, Fitzer testified at a hearing on the motion for new trial.  Doc. 12-1, Ex. 44, p.457.  During the hearing, he testified that he arranged to meet with Chappell to get drugs in exchange for a stolen car radio. Doc. 12-1, Ex. 44, p.458. He further testified that Chappell was upset and "cussed him out" because he believed Fitzer had wasted his time.  Fitzer stated he then shot Chappell and set him on fire.  Doc. 12-1, Ex. 44, p.458.  The trial court denied the motion for new trial in May 2010.  Doc. 12-1, Ex. 38.  Braun appealed the trial court's denial of the motion for new trial on June 11, 2010.  Doc. 12-1, Ex. 41.   The Eighth District Court of Appeals issued its opinion affirming the judgment of the trial court on April 7, 2011.  Doc. 12-1, Ex. 44.  Braun did not appeal the Eighth District's decision on the motion for new trial to the Ohio Supreme Court.  Doc. 54, pp.6-7.  Braun now characterizes Fitzer as "the real killer."  Doc. 47, p. 6.

### III. Law

### A.  Standard of Review under AEDPA

The provisions of the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104-132, 110 Stat. 1214 ("AEDPA"), apply to Braun's habeas petition because he filed it after the effective date of the AEDPA.  28 U.S.C. § 2254.  *Stewart v. Erwin*, 503 F.3d 488, 493 (6th Cir. 2007).  In particular, the controlling AEDPA provision states:

---

[9] Fitzer's affidavit was inconsistent with statements he had made earlier.  Prior to Braun's trial Fitzer told authorities on several occasions that Braun killed Chappell.  Doc. 12-3, pp. 11-12, 49.  Fitzer testified at the motion for new trial hearing that, at the time of Braun's trial, he informed his lawyer that he wanted to take back his plea and recant his statements implicating Braun.  Doc. 12-3, p.12.  Fitzer stated he did not admit responsibility for killing Chappell at that time.  Doc. 12-3, p. 12.

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  A decision is "contrary to" clearly established federal law when the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or decides a case differently than the Supreme Court has on a set of materially indistinguishable facts.  *Otte v. Houk*, 654 F.3d 594, 599 (6th Cir. 2011) (quoting *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000)).  A state court's adjudication only results in an "unreasonable application" of clearly established federal law when the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.  *Id*. at 599-600 (quoting *Williams*, 529 U.S. at 413).  "The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous." *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003).  "The state court's application of clearly established law must be objectively unreasonable." *Id.*

In order to obtain federal habeas corpus relief, a petitioner must establish that the state court's decision was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair minded disagreement."  *Bobby v. Dixon*, 132 S. Ct. 26, 27 (2011) (quoting *Harrington v. Richter*, 131 S. Ct. 770, 786–87 (2011)). This bar is "difficult to meet" because "habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through

appeal." *Richter*, 131 S. Ct. at 786 (quoting *Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (1979)

(Stevens, J., concurring in judgment)).  In short, "[a] state court's determination that a claim

lacks merit precludes federal habeas relief so long as 'fair minded jurists could disagree' on the

correctness of the state court's decision." *Id.* (quoting *Yarborough v. Alvarado*, 541 U.S. 652,

664 (2004)).  The petitioner carries the burden of proof.  *Cullen v. Pinholster*, 131 S.Ct. 1388,

1398 (2011).

### B.  Exhaustion and Procedural Default

Under the AEDPA, a petitioner must meet certain procedural requirements in order to

have his claims reviewed in federal court.  *Smith v. Ohio Dep't of Rehab. & Corr.*, 463 F.3d 426,

430 (6th Cir. 2006).  "Procedural barriers, such as statutes of limitations and rules concerning

procedural default and exhaustion of remedies, operate to limit access to review on the merits of

a constitutional claim." *Daniels v. United States*, 532 U.S. 374, 381 (2001).  Although

procedural default is sometimes confused with exhaustion, exhaustion and procedural default are

distinct concepts.  *Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir. 2006).  Failure to exhaust

applies where state remedies are "still available at the time of the federal petition." *Id.* at 806

(quoting *Engle v. Isaac*, 456 U.S. 107, 125 n.28 (1982)).  In contrast, where state court remedies

are no longer available, procedural default rather than exhaustion applies.  *Williams*, 460 F.3d at

806.

**Exhaustion.**  A federal court may not grant a writ of habeas corpus unless the petitioner

has exhausted all available remedies in state court.  28 U.S.C. § 2254(b)(1)(A).  A state

defendant with federal constitutional claims must fairly present those claims to the state courts

before raising them in a federal habeas corpus action.  28 U.S.C. § 2254(b), (c); *Anderson v.

Harless*, 459 U.S. 4, 6  (1982) (per curiam); *Picard v. Connor*, 404 U.S. 270, 275–76 (1971); *see*

*also Fulcher v. Motley*, 444 F.3d 791, 798 (6th Cir. 2006) (quoting *Newton v. Million*, 349 F.3d 873, 877 (6th Cir. 2003)) ("[f]ederal courts do not have jurisdiction to consider a claim in a habeas petition that was not 'fairly presented' to the state courts"). A constitutional claim for relief must be presented to the state's highest court in order to satisfy the fair presentation requirement. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 845-48 (1999); *Hafley v. Sowders*, 902 F.2d 480, 483 (6th Cir. 1990).

In order to satisfy the fair presentation requirement, a habeas petitioner must present both the factual and legal underpinnings of his claims to the state courts. *McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000). This means that the petitioner must present his claims to the state courts as federal constitutional issues and not merely as issues arising under state law. *See, e.g.*, *Franklin v. Rose*, 811 F.2d 322, 325 (6th Cir. 1987); *Prather v. Rees*, 822 F.2d 1418, 1421 (6th Cir. 1987). In determining whether a petitioner presented his claim in such a way as to alert the state courts to its federal nature, a federal habeas court should consider whether the petitioner: (1) relied on federal cases employing constitutional analysis; (2) relied on state cases employing constitutional analysis; (3) phrased the claim in terms of constitutional law or in terms sufficiently particular to allege a denial of a specific constitutional right; or (4) alleged facts well within the mainstream of constitutional law. *McMeans*, 228 F.3d at 681.

**Procedural Default.** Procedural default may occur in two ways. *Williams*, 460 F.3d at 806. First, a petitioner procedurally defaults a claim if he fails "to comply with state procedural rules in presenting his claim to the appropriate state court." *Id.* In *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986), the Sixth Circuit provided four prongs of analysis to be used when determining whether a claim is barred on habeas corpus review due to petitioner's failure to comply with a state procedural rule: (1) whether there is a state procedural rule applicable to

petitioner's claim and whether petitioner failed to comply with that rule; (2) whether the state court enforced the procedural rule; (3) whether the state procedural rule is an adequate and independent state ground on which the state can foreclose review of the federal constitutional claim and (4) whether the petitioner can demonstrate cause for his failure to follow the rule and that he was actually prejudiced by the alleged constitutional error. *See also Williams*, 460 F.3d at 806 ("If, due to the petitioner's failure to comply with the procedural rule, the state court declines to reach the merits of the issue, and the state procedural rule is an independent and adequate grounds for precluding relief, the claim is procedurally defaulted.") (citing *Maupin*, 785 F.2d at 138).

Second, "a petitioner may procedurally default a claim by failing to raise a claim in state court, and pursue that claim through the state's 'ordinary appellate review procedures.'" *Williams*, 460 F.3d at 806 (citing *O'Sullivan*, 526 U.S. at 848).   "If, at the time of the federal habeas petition, state law no longer allows the petitioner to raise the claim, the claim is procedurally defaulted." *Williams*, 460 F.3d at 806.  While the exhaustion requirement is technically satisfied because there are no longer any state remedies available to the petitioner, see *Coleman v. Thompson,* 501 U.S. 722, 732 (1991), the petitioner's failure to have the federal claims considered in the state courts constitutes a procedural default of those claims that bars federal court review.  *Williams,* 460 F.3d at 806.

To overcome a procedural bar, a petitioner must show cause for the default and actual prejudice that resulted from the alleged violation of federal law or that there will be a fundamental miscarriage of justice if the claims are not considered.  *Coleman*, 501 U.S. at 750.

### C.  Cognizability

A federal court may review a state prisoner's habeas petition only on the grounds that the challenged confinement violates the Constitution, laws or treaties of the United States. 28 U.S.C. § 2254(a). A federal court may not issue a writ of habeas corpus "on the basis of a perceived error of state law." *Pulley v. Harris*, 465 U.S. 37, 41, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984); *Smith v. Sowders*, 848 F.2d 735, 738 (6th Cir. 1988). It is "not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Estelle v. McGuire*, 502 U.S. 62, 67-68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991). A federal court "must defer to a state court's interpretation of its own rules of evidence and procedure when assessing a habeas petition." *Miskel v. Karnes*, 397 F.3d 446, 453 (6th Cir. 2005) (internal quotation omitted). Claims of state law error are not cognizable in federal habeas corpus "unless such error amounts to a fundamental miscarriage of justice or a violation of the right to due process in violation of the United States Constitution."  *Cristine v. McKee,* 526 F.3d 888, 897 (6th Cir. 2008).

### IV.  Claims Analysis

### A.  Claims Overview

Petitioner sets forth six Grounds for relief with various subparts or subclaims.  Respondent argues that Ground One, parts of Ground Two, parts of Ground Three, and Ground Six are procedurally defaulted and, therefore, barred from federal habeas review.  For the reasons explained below, the undersigned concludes the following:

- Petitioner has procedurally defaulted a portion of Ground One and the remainder of Ground One is without merit.

- Petitioner has procedurally defaulted a portion of Ground Two and the remainder of Ground Two is without merit.

- Petitioner has procedurally defaulted a portion of Ground Three and the remainder of Ground Three is without merit.

- Petitioner has procedurally defaulted a portion of Ground Four and the remainder of Ground Four is without merit.

- Ground Five is without merit.

- Ground Six:  Braun's claim for relief arising from his post-trial proceeding is procedurally defaulted.

Based on the aforementioned, the undersigned concludes that federal habeas relief should be denied.

**B.  Ground One**

In Ground One, Braun asserts that "the state improperly and unconstitutionally withheld exculpatory and/or impeachment evidence from Mr. Braun in violation of its obligations under *Brady* and the due process clause of the Fifth Amendment."  Doc. 47, p.14.  *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct.1194, L.Ed.2d 215 (1963), and its progeny held that due process is violated when the prosecution suppresses evidence favorable to the accused in a criminal case if the evidence is material to guilt or to sentencing. *Id.* at 87.

Braun argues that the state suppressed two types of favorable evidence violating *Brady*: A) statements by Stephen Lenchak, James Reardon, and Jeremy Payne indicating that John Shear shot the victim; and B) impeachment evidence relating to the jailhouse journals of Matthew Stedman.  Doc. 47, p.20.  Respondent concedes that the first portion of Braun's *Brady* claim contained in Ground One (A),[10] concerning statements of Lenchak, Reardon, and Payne, was fairly presented to the state courts and is not procedurally defaulted.  Doc. 52, p.37 & Doc. 56, p.7.  As to Ground One (B), Respondent argues, and this Court agrees, that Braun has procedurally defaulted his *Brady* claim relating to Stedman's jailhouse journals.

---

[10] Braun's Petition lists this ground as Claim One (B).  Claim One (A), however, is a discussion of federal law and not a subpart of Claim One.

### 1.  Ground One (A) Merits Review

In Ground One (A) Braun argues that the state violated *Brady* by withholding

exculpatory evidence (statements of Lenchak, Reardon, and Payne) that John Shear, not Braun,

killed the victim.  Doc. 47, pp. 20-21.  A *Brady* violation consists of three elements, as set forth

by *Strickler v. Greene,* 527 U.S. 263, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999).  Braun must

establish that (1) the evidence was favorable to him, (2) it was suppressed (whether intentionally

or not) by the government, and (3) prejudice ensued. *Id.* at 281-82, 119 S.Ct. 1936.

#### i.  Prong 1 – Favorability

Respondent does not dispute the first prong of the test, that the statements were favorable

to Braun.  Instead, Respondent argues that Braun has not met the second and third *Brady* prongs

(suppression and prejudice).

#### ii.  Prong 2 – Suppression

Braun argues that the state suppressed the written statements of Reardon, Lenchak, and

Payne, which contained allegations that John Shear was the shooter of the victim. Doc. 47, p. 26.

The statements were taken in 2005 and 2006, but were not provided to the defense until just prior

to opening statements in Braun's trial.  Doc. 47, p.26.

The Eighth District Court of Appeals, applying *Brady* rejected Braun's suppression claim

because summaries of Reardon's and Lenchak's statements were given to the defense well in

advance of trial (August 27, 2007).  Doc. 12-1, Ex. 29, p. 236.  The summaries alleged that John

Shear shot the victim, but also indicated that Shear had an accomplice who helped him burn the

body.  Doc. 12-1, Ex. 29, p.236.   A summary of Payne's statement was not provided, but the

appellate court found that statement was made in Braun's presence.  Doc. 12-1, Ex. 29, p.236.

Furthermore, the full witness statements of all three witnesses were given to Braun before

testimony began.  Doc. 47, p.22.   Accordingly, the appellate court found no *Brady* violation.

Doc. 12-1, Ex. 29, p. 237.

Braun admits that all three statements were provided prior to opening statements, but

contends that he was unable to make effective use of the exculpatory material at that point.  Doc.

47, p. 25.  Braun argues that due process requires "disclosure of exculpatory material be made is

sufficient to permit the defendant to make effective use of that material at trial." *United States*

*v.Farley,* 2 F.3d 645, 654 (6th Cir. 1993) (*citing United States v. Presser*, 844 F.2d 1275, 1284

(6th Cir. 1988)); *see also United States v. Mose*r, 870 F.2d 658 at *2 (6th Cir. 1988) (same);

United States v. Monroe, 210 F.3d 373, at *4 (6th Cir. 2000) ("If previously undisclosed

evidence is disclosed during trial, no Brady violation occurs unless the defendant has been

prejudiced by the delay in disclosure.").

In cases cited by Braun, the Sixth Circuit found the government fulfills its constitutional

obligation by disclosure at trial unless the defendant can establish that presentation of his defense

was so prejudiced that he was denied his constitutionally guaranteed right to a fair trial. *Id.* at

1282; *United States v. Patrick,* 965 F.2d 1390, 1400 (6th Cir.) ("Delay [in disclosure] only

violates *Brady* when the delay itself causes prejudice."), *cert. denied,* ⸺ U.S. ⸺, 113 S.Ct.

376, 121 L.Ed.2d 287 (1992).  As all of the statements at issue were submitted to Braun prior to

opening statements, the appellate court's decision that the State did not violate *Brady* was not

contrary to, or an unreasonable application of the law.  As such, Braun has not established that

the evidence was suppressed.  However, even if Braun could meet the suppression prong, he fails

to satisfy the prejudice prong.

### iii.  Prong 3 - Prejudice

"The prejudice (or materiality) element of a Brady violation is established if there is a reasonable probability of a different outcome of the trial had the *Brady* material been available." *Jamison v. Collins,* 291 F.3d 380, 385 (6th Cir.2002).  For purposes of determining reasonable probability, "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley,* 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995).  Braun argues that, under *Kyles*, the combined effect of the State's suppression of the three witness statements impacted the outcome of his trial. Doc. 47, p.28.

Evidence that is "merely cumulative" to evidence presented at trial is "not material for purposes of *Brady* analysis." *Carter v. Mitchell,* 443 F.3d 517, 533 n. 7 (6th Cir. 2006).  *See also, Brooks v. Tennessee*, 626 F.3d 878, 893 (6th Cir. 2010).  In this case, the written statements of Reardon, Lenchak, and Payne that Shear shot Chappell were merely cumulative to the evidence presented at trial and, as such, are not material for purposes of a *Brady* analysis.  There were several witnesses at trial who testified to Shear's involvement in the Chappell murder. Michael Graham testified that Shear told him that there was an argument with the victim over drugs, the victim was shot, and they burned him up with gas.  Doc. 12-1, Ex. 29, p. 216.  Daniel Quarrick also testified that Shear told him that he and Braun called the victim to get drugs, then robbed, killed, and burned him up.  Doc. 12-1, Ex. 29, pp.218-219.  Therefore, it cannot be said that there is a reasonable probability of a different outcome at trial had the *Brady* material been available.[11]

---

[11]  Moreover, Braun currently contends that Fitzer is "the real killer."  Doc. 47, p. 6.  This contention undermines his argument that, due to the late receipt of the Lenchak, Reardon, and Payne statements implicating Shear, he did not

### 2.  Ground One (B) is procedurally defaulted

In Ground One (B), Braun asserts that the state committed a *Brady* violation by failing to timely disclose the Stedman journals.   Doc. 47, p.28.  Respondent argues, and this Court agrees, that Braun has procedurally defaulted this portion of his first claim for relief.

Braun asserts that he fairly presented the portion of his *Brady* claim regarding Stedman's journals.  He contends that he asserted this claim in his brief to the Eighth District Court of Appeals in his First Assignment of Error.  Doc. 54, p.28.  A review of the record reveals that, although Braun asserted a *Brady* claim with regard to Stedman in his First Assignment of Error, the claim was that the State violated *Brady* by not timely disclosing "information concerning a key prosecution witness's (Matthew Stedman) extensive international history of impersonation and skilled deception."  Doc. 12-1, p.102.  Braun's First Assignment of Error stated that he did not receive information on Stedman's background; it did not contain any discussion regarding the journal that Stedman kept of his conversations with Braun.  Doc. 12-1, p.102.

Braun's Third Assignment of Error in his state court of appeals brief presented the disclosure of Stedman's journals as an issue.  However, Braun did not present a *Brady* or other federal claim.  Instead, Braun framed his claim as a violation of Ohio Rule of Criminal Procedure 16, which governs discovery in criminal actions.  Doc. 12-1, Pgs.112-114, Ex. 24.  Braun did not cite to *Brady* nor make any arguments under *Brady*.  As a result, the Ohio Court of Appeals did not consider this claim under *Brady*.  Doc. 12-1, Ex. 24.  In Braun's jurisdictional memoranda to the Ohio Supreme Court, Braun again presented his claim as a violation of Ohio Criminal Rule 16, stating, "[t]he State's failure to timely produce the Stedman letters and logs entitles Braun to a new trial.  The letters and logs were squarely within the scope of Braun's

---

receive a fair trial, "understood as a trial resulting in a verdict worthy of confidence."  *Kyles v. Whitley,* 514 U.S. at 434.

discovery requests and Rule 16...Braun was prejudiced by the non-disclosure and is thus entitled to a new trial."  Doc. 12-1, p.285.

To fairly present a claim a "petitioner must present his claim to the state courts as a federal constitutional issue - not merely as an issue arising under state law."  *Koontz v. Glossa*, 731 F.2d 365, 368 (6th Cir. 1984).  As Braun presented the claim relating to Stedman's journals as "merely an issue arising under state law," Braun had failed to exhaust Ground One (B).

Since Braun's direct appeal has concluded, he would be barred by *res judicata* from attempting to assert his unexhausted claims in another state proceeding.  *See, e.g, State v. Perry*, 10 Ohio St.2d 175, 175-76, 22 N.E.2nd 104, syllabus (Ohio 1967).  The Sixth Circuit has consistently held that *res judicata* is an adequate and independent ground establishing procedural default.  *See, e.g., Carter v. Mitchell,* 443 F.3d 517, 538 (6th Cir. 2006), *Jacobs v. Mohr,* 265 F.3d 407, 417 (6th Cir. 2001) (finding that "Ohio's doctrine of *res judicata* as a procedural bar is regularly applied by the Ohio Courts").  As such, under *Maupin v. Smith,* 785 F.2d 135 (6th Cir. 1986), these claims are procedurally defaulted unless Braun can show cause for the default and actual prejudice.  Braun does not argue cause or prejudice for his procedural default on his *Brady* claim.  Accordingly, Braun's First Ground for Relief as it relates to the Stedman journals, Ground One (B), is procedurally defaulted.

**C.  Ground Two**

In Ground Two, Braun asserts that his constitutional right to a fair trial under the due process clause was violated.  Doc. 47, p.37.  In support of this claim, Braun lists nine subclaims in which he asserts his constitutional right to a fair trial was violated (Grounds Two (A)-(I)).  Respondent argues that seven of these subclaims (Grounds Two (A)-(G)) have been procedurally defaulted because Braun presented these claims to the state courts as a violation of state law, not of federal

constitutional rights.[12] Doc. 52, p.37. As discussed above, in order to satisfy the fair

presentation requirement, a habeas petitioner must present his claims to the state courts as federal

constitutional issues and not merely as issues arising under state law. *See, e.g.*, *Franklin v. Rose*,

811 F.2d 322, 325 (6th Cir. 1987); *Prather v. Rees*, 822 F.2d 1418, 1421 (6th Cir. 1987). Each

subclaim will be discussed individually below.

### 1. Ground Two (A) is without merit

In Ground Two (A), Braun challenges as a due process violation the trial court's denial of

a trial continuance following the State's disclosure of evidence (statements by Reardon,

Lenchak, and Payne) just prior to opening statements. Doc. 47, p.37. Braun presented this

subclaim on direct appeal to the Eighth District Court of Appeals in his second assignment of

error (Doc. 12-1, Ex. 24, p.111) and to the Ohio Supreme Court in his second proposition of law

(Doc. 12-1, Ex. 31, p. 284). In his second assignment of error Braun argued that the trial court's

denial of a continuance denied Braun a "fair trial" and induced ineffective assistance of counsel

under the Sixth Amendment. Doc. 12-1, Ex. 24, pp.112-113. Braun cited Ohio cases dealing

with *Brady* issues and how those issues impact a defendant's constitutional rights to due process

and a fair trial. Doc. 12-1, Ex. 24, pp.112-113; *State v. Iacona*, 93 Ohio St.2d 83, 100-01 (2001);

*State v. Johnson*, 24 Ohio St.3d 87, 95 (1986). In Braun's jurisdictional memorandum filed with

the Ohio Supreme Court, he argued that the trial court's denial of his motion for mistrial or

continuance after receiving the "three suppressed police reports" denied him "a fair trial and due

process of law, and it induced ineffective assistance of counsel." Doc. 12-1, Ex. 31, p.284.

Braun did not cite to any state or federal cases in support of this claim. Accordingly, Respondent

asserts that this claim has not been exhausted. Doc. 52, p. 37. Rather than decide the exhaustion

issue, this claim can be dismissed on the merits. 28 U.S.C. § 2254(b)(2). ("An application for a

---

[12] Respondent has not argued that Ground Two subparts (H) and (I) are procedurally defaulted.

writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.")

As to the merits, claims of state law error are not cognizable in federal habeas corpus "unless such error amounts to a fundamental miscarriage of justice or a violation of the right to due process in violation of the United States Constitution." *Cristine v. McKee,* 526 F.3d 888, 897 (6th Cir. 2008). As discussed above in reference to Ground One (A), the reports in question were not suppressed. Accordingly, it cannot be said that the trial court's denial of a continuance after receiving the reports violated Braun's right to due process. Ground Two (A) is without merit.

### 2.  Ground Two (B) is without merit

Ground Two (B) challenges the trial court's admission of six pieces of "other acts" evidence. The "other acts" were detailed in Matthew Stedman's journals of conversations he had with Braun while the two were in jail together.[13] Doc. 47, p.41. Braun presented this subclaim on direct appeal to the Eighth District Court of Appeals in his sixth assignment of error (Doc. 12-1, Ex. 24, p.120) and to the Ohio Supreme Court in his sixth proposition of law (Doc. 12-1, Ex. 31, p. 288). Although Braun argued to the state courts that admission of the other acts evidence violated Ohio Evidence Rule 404(B), he also argued in both appeals that he was denied his right to a fair trial and due process under the Fifth and Fourteenth Amendments and cited United Supreme Court cases in support. Doc. 12-1, Ex. 24, pp. 120-127, 288-289. *See e.g. Montana v. Eglehoff*, 518 U.S. 37, 43 (1996); *Green v. Georgia,* 422 U.S. 95, 97 (1979). As the record

---

[13] The "other acts" admitted include Braun's alleged involvement in: (1) the attempted murder and robbery of Tom McDonald; (2) a murder and robbery at the Peanut Bar; (3) a murder at Lucasville Prison; (4) the theft of a Corvette and $40,000 from a 53-year-old woman; (5) shooting up "a guy's house;" and (6) an armed robbery and shooting of a drug dealer. Doc. 12-1, Ex. 29, p. 244.

reflects, Braun fairly presented the Ohio courts with the substance of the federal claim he now asserts in Ground Two (B).  Accordingly, that claim will be reviewed on the merits.

As to the merits, claims of state law error are not cognizable in federal habeas corpus "unless such error amounts to a fundamental miscarriage of justice or a violation of the right to due process in violation of the United States Constitution."  *Cristine v. McKee,* 526 F.3d 888, 897 (6th Cir. 2008).  When Braun took the stand in his own defense, he admitted to a whole litany of criminal activity including promoting prostitution, robbery, drug trafficking, car theft, drug use, as well as his fear that he was going to be indicted for the Peanut Bar murder and the murder of a girl on Denison Avenue.  Doc. 12-1, Ex. 29, p.248.  Accordingly, it cannot be said that the admission of the "other acts" evidence through Stedman's journal violated Braun's right to due process as it was merely cumulative to Braun's own admissions and, therefore, did not amount to a fundamental miscarriage of justice.

Moreover, the admission of prior bad acts evidence was not contrary to clearly established Supreme Court precedent. There is no clearly established Supreme Court precedent that holds that a state violates due process by permitting propensity evidence in the form of other bad acts evidence. *Bugh v. Mitchell*, 329 F.3d 496, 512-13 (6th Cir. 2003).  Accordingly, the state court's decision in this case is not "contrary to" Supreme Court precedent.

For all of the above reasons, Ground Two (A) is without merit.

### 3.  Ground Two (C) is procedurally defaulted

In Ground Two (C), Braun challenges on due process grounds the admission of jailhouse informant Matthew Stedman's journals and letters (containing contemporaneous jailhouse conversations between him and Braun).  Braun presented this subclaim on direct appeal to the Eighth District Court of Appeals in his fifth assignment of error (Doc. 12-1, Ex. 24, p.116) and to

the Ohio Supreme Court in his fifth proposition of law (Doc. 12-1, Ex. 31, p. 286). In his brief to the Eighth District, Braun alleged that the admission of the Stedman journals was a violation of Ohio Evidence Rule 801(D)(1)(b).  Braun argues, however, that his Ground Two (C) claim is not procedurally defaulted because he alleged the admission of the journals "violated his right to a fair trial" and that he cited relevant Supreme Court and Sixth Circuit case law.  Doc. 54, p.43. *See e.g. Tome v. U.S.,* 513 U.S. 150 (1995); *U.S. v. Goins*, 186 Fed. Appx. 586, 589 (6th Cir. 2006).

Although Braun relied on some federal cases in support of his evidence rules argument those cases did not employ a constitutional analysis. *Id.*  Doc 12-1, Ex. 24, pp. 117, 287.  Braun's conclusory statement that the admission of the journals "violated his right to fair trial" is not sufficient to satisfy the fair presentation requirement for habeas review.  *Gray v. Netherland,* 518 U.S. 152, 163, 116 S. Ct. 2074, 2081, 135 L. Ed. 2d 457 (1996) (It is not enough to make a general appeal to a constitutional guarantee as broad as due process to present the "substance" of such a claim to a state court). As the state court was only presented with Braun's claim of error under the Ohio Rules of Evidence, understandably the court confined its analysis to the application of state law.

As Braun failed to present the substance of his constitutional claim to the state court, he has had failed to exhaust Ground Two (C).  As Braun's direct review has concluded, he would be barred by res judicata from attempting to assert his unexhausted claims in another state proceeding.  *See, e.g, State v. Perry,* 10 Ohio St.2d 175, 175-76, 22 N.E.2nd 104, syllabus (Ohio 1967).  As res judicata is an adequate and independent ground establishing procedurally default, and as Braun did not argue cause or prejudice for his default, Braun's Ground Two (C) claim is

procedurally defaulted.  *See, e.g., Carter v. Mitchell,* 443 F.3d 517, 538 (6th Cir. 2006), *Jacobs v. Mohr,* 265 F.3d 407, 417 (6th Cir. 2001).

### 4.  Ground Two (D) is procedurally defaulted

In Ground Two (D), Braun challenges as a violation of due process the trial court's admission of evidence relating to a bullet taken from the apartment of a victim in another state case in which Braun was indicted.  Doc. 47, p. 51.  Braun presented this subclaim on direct appeal to the Eighth District Court of Appeals in his ninth assignment of error (Doc. 12-1, Ex. 24, p.131) and to the Ohio Supreme Court in his fifth proposition of law (Doc. 12-1, Ex. 31, p. 291).  Braun argues that Ground Two (D) is not procedurally defaulted because "his state court appellate briefs properly addressed the relevant constitutional issues on this claim."  Doc. 54, p.41.  However, Braun's state court appellate briefs did not fairly present this claim.

Braun merely stated in his appellate briefs that the admission of the bullet evidence denied him his right to a fair trial.  Doc. 12-1, Ex. 24, p.131, 291.  The Eighth District Court of Appeals recognized that Braun cited no law, federal or state, to support his argument that the bullet evidence was inadmissible and dismissed his claim accordingly.  Doc. 12-1, Ex. 29, p.258. A general appeal to the constitution is not sufficient to satisfy the fair presentation requirement. *Gray v. Netherland,* 518 U.S. 152, 163, 116 S. Ct. 2074, 2081, 135 L. Ed. 2d 457 (1996).   As discussed more fully with respect to Ground Two (C), Braun failed to fairly present the substance of Ground Two (D) to the state court, he failed to exhaust this subclaim and is now procedurally barred from doing so.  (i.e. the claim is procedurally defaulted).  *See, e.g., Carter v. Mitchell,* 443 F.3d 517, 538 (6th Cir. 2006), *Jacobs v. Mohr,* 265 F.3d 407, 417 (6th Cir. 2001).

### 5.   Ground Two (E) is without merit

In Ground Two (E), Braun challenges the trial court's decision to exclude the testimony of witness Tracy Mechling.  Doc. 47, p.59.  Braun presented this subclaim on direct appeal to the Eighth District Court of Appeals in his eighth assignment of error (Doc. 12-1, Ex. 24, p.130) and to the Ohio Supreme Court in his eighth proposition of law (Doc. 12-1, Ex. 31, p. 290).   Braun argued in both appeals that the exclusion of Tracy Mechling's testimony deprived him of a fair trial and due process of law under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.  Doc. 12-1, Ex. 24, 31, pp.130, 290.  In support, Braun cited federal cases that addressed the constitutional right to present a defense.  Doc. 12-1, Ex. 24, 31, pp. 130, 290.  *See e.g. United States v. Serrano*, 406 F.3d 1208, 1214 (10th Cir. 2005); *Washington v. Texas*, 388 U.S. 14, 19 (1976).  As the record reflects, Braun fairly presented the Ohio courts with the substance of the federal claim he now asserts in Ground Two (E). Accordingly, that claim will be reviewed on the merits.

As to the merits, the trial court held a hearing outside the presence of the jury to determine whether or not Tracy Mechling's testimony would be admitted.  Doc. 12-1, Ex. 29, p. 256.  During that hearing, Tracy Mechling testified that her husband, Robert Mechling, said he killed and "burnt" someone.  Doc. 12-1, Ex. 29, p. 256.  The appellate court found that the trial court did not err in ruling that Tracy's testimony regarding what her ex-husband said was inadmissible hearsay where none of the hearsay exceptions applied and where Robert Mechling was available to testify.  Doc. 12-1, Ex. 29, p. 256-57.  The appellate court did not expressly address Braun's federal claim, however, when a state court rejects a federal claim without expressly addressing that claim, a federal habeas court must presume that the federal claim was

34

adjudicated on the merits.  *Johnson v. Williams*, 133 S. Ct. 1088, 1096, 185 L. Ed. 2d 105 (2013)

*reh'g denied,* 133 S. Ct. 1858, 185 L. Ed. 2d 858 (U.S. 2013).

A defendant's right to present relevant evidence is not unlimited; rather, it is subject to

reasonable restrictions. See *Taylor v. Illinois,* 484 U.S. 400, 410, 108 S.Ct. 646, 653-654, 98

L.Ed.2d 798 (1988); *Rock v. Arkansas,* 483 U.S. 44, 55, 107 S.Ct. 2704, 2711, 97 L.Ed.2d 37

(1987); *Chambers v. Mississippi,* 410 U.S. 284, 295, 93 S.Ct. 1038, 1045-1046, 35 L.Ed.2d 297

(1973). A defendant's interest in presenting such evidence may thus "bow to accommodate other

legitimate interests in the criminal trial process " *Rock,* 483 U.S. at 55. (quoting *Chambers,*

*supra,* at 295, 93 S.Ct., at 1046); *accord, Michigan v. Lucas,* 500 U.S. 145, 149, 111 S.Ct. 1743,

1746, 114 L.Ed.2d 205 (1991). As a result, state and federal rule makers have broad latitude

under the Constitution to establish rules excluding evidence from criminal trials. Such rules do

not abridge an accused's right to present a defense so long as they are not "arbitrary" or

"disproportionate to the purposes they are designed to serve." *Rock,* 483 U.S. at at 56, 107 S.Ct.,

at 2711.  The Supreme Court finds the exclusion of evidence to be unconstitutionally arbitrary or

disproportionate only where it has infringed upon a weighty interest of the accused. *Washington*

*v. Texas,* 388 U.S. 14, 22-23, 87 S.Ct. 1920, 1924-1925, 18 L.Ed.2d 1019 (1967).

State and federal governments unquestionably have a legitimate interest in ensuring that

reliable evidence is presented to the trier of fact in a criminal trial. Indeed, the exclusion of

unreliable evidence is a principal objective of many evidentiary rules. See, *Daubert v. Merrell*

*Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 589, 113 S.Ct. 2786, 2794-2795, 125 L.Ed.2d 469

(1993).*United States v. Scheffer*, 523 U.S. 303, 308-09, 118 S. Ct. 1261, 1264-65, 140 L. Ed. 2d

413 (1998).  The appellate court's decision finding no error in the trial court's  ruling that

Tracy's testimony  regarding what her ex-husband said was inadmissible because it was

unreliable hearsay is not contrary to or an unreasonable application of federal law. Accordingly, Ground Two (E) is without merit.

### 6.  Grounds Two (F) & (G) are procedurally defaulted

Braun claims his due process rights were violated when the trial court refused to permit him to personally view any prior written witness statements during the trial (Ground Two (F)) and ruled that no such statement could be used without submitting the full statement into evidence (Ground Two (G)). Doc. 47, p.63.

Braun's due process arguments in Grounds Two (F) and (G) are duplicative, as he later argues a violation of his right to confrontation in Ground Four (B) and Ground Four (C) based upon these same trial court rulings. Doc. 47, pp. 103-107.  With regard to fair presentation, Braun complained of these issues on direct appeal to the Eighth District Court of Appeals in his tenth assignment of error (Doc. 12-1, Ex.24, p.132) and to the Ohio Supreme Court in his tenth proposition of law (Doc. 12-1, Ex. 31, p. 291).  However, Braun's argument was presented only as a Confrontation Clause violation, citing federal Confrontation Clause cases.  Doc. 12-1, Ex. 24, 31, p. 132, 291.  Braun accompanied his Confrontation Clause arguments with a statement that the trial court ruling "denied him his rights to meaningful cross-examination, to confront witnesses against him, to the effective assistance of counsel, and to a fair trial."  Doc. 12-1, Ex. 24, p.132.

An isolated allusion to "a fair trial" fails to afford the state court adequate notice that a petitioner intended to invoke the Due Process Clause. *See, e.g.*, *Slaughter v. Parker,* 450 F.3d 224, 236 (6th Cir.2006) (where a petitioner alleged that he had been deprived of "due process and a fair trial by an impartial jury" and cited the Sixth and Fourteenth Amendments, he had not "fairly presented" a federal claim to the state courts); *Blackmon v. Booker,* 394 F.3d 399, 400

(6th Cir.2004) ("[G]eneral allegations of the denial of rights to a 'fair trial' and 'due process' do not 'fairly present claims' that specific constitutional rights were violated.") (internal citations omitted); *see also Riggins v. McGinnis,* 50 F.3d 492, 494 (7th Cir.1995) ("A lawyer need not develop a constitutional argument at length, but he must make one; the words 'due process' are not an argument.").  As such, Braun's due process claim was not exhausted because it was not fairly presented to the state courts.  Because Braun would now be barred from presenting this claim to the state courts it is procedurally defaulted.

As previously mentioned, Braun's due process arguments in these sections are duplicative of his Ground Four (B) and Ground Four (C) Confrontation Clause claims.  As Respondent did not raise the fair presentation issue with respect to Ground Four (B) or Ground Four (C), the merits will be discussed in the corresponding sections below.

### 7.  Ground Two (H) is without merit

In Ground Two (H), Braun argues he was denied a fair trial due to the State committing seven instances of alleged prosecutorial misconduct. Doc. 47, p.76.  The seven alleged instances are:

(1) The prosecutor failed to comply with his obligations under *Brady.*

(2) The prosecutor did not authenticate audiotaped conversations between Braun's co-defendant and the co-defendant's mother that were played for the jury.

(3) The prosecutor introduced the journals of Matthew Stedman.

(4) The prosecutor presented six "other acts" allegedly commit by Braun.

(5) The prosecutor introduced evidence of an anonymous Crime Stoppers tip and introduced evidence that John Shear made an oral "proffer" to police and blamed Braun for the killing.

(6) The prosecutor belittled and mocked Braun for asserting his constitutional rights.

(7) The prosecutor made numerous prejudicial comments during closing argument.

Doc. 47, pp. 76-78.  Braun argues that the numerous and repeated instances of prosecutorial

misconduct prejudiced him and denied him a right to fair trial.  Doc. 47, pp. 78-79.  *Greer v.*

*Miller*, 483 U.S. 756, 765 (1987); *United States v. Bagley*, 473 U.S. 667, 676 (1985); *Rector v.*

*Wolfe*, 2012 WL 3932772 (6th Cir. September 10, 2012).

Braun presented this subclaim on direct appeal to the Eighth District Court of Appeals in

his eleventh assignment of error (Doc. 12-1, Ex. 24, p.133) and to the Ohio Supreme Court in his

eleventh proposition of law (Doc. 12-1, Ex. 31, p. 292).  The Eighth District stated the following

with regard to Braun's allegations of prosecutorial misconduct:

> {¶ 134} A prosecuting attorney's conduct during trial does not constitute grounds for
> error unless the conduct deprives the defendant of a fair trial. *State v. Keenan* (1993), 66
> Ohio St.3d 402-405, 613 N.E.2d 203; *State v. Gest* (1995), 108 Ohio App.3d 248, 257,
> 670 N.E.2d 536. The touchstone of a due process analysis in cases of alleged
> prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor.
> *Smith v. Phillips* (1982), 455 U.S. 209, 102 S.Ct. 940, 71 L.Ed.2d 78. The effect of the
> prosecutor's misconduct must be considered in light of the whole trial. *State v. Durr*
> (1991), 58 Ohio St.3d 86, 94, 568 N.E.2d 674; *State v. Maurer* (1984), 15 Ohio St.3d
> 239, 266, 473 N.E.2d 768. Furthermore, a prosecutor is afforded wide latitude during
> closing argument, and it is within the trial court's sound discretion to determine whether a
> comment has gone too far. *State v. Benge,* 75 Ohio St.3d 136, 661 N.E.2d 1019, 1996-
> Ohio-227.
>
> {¶ 135} Braun enumerates eight claimed instances of prosecutorial misconduct[14] and
> argues that the cumulative effect of the misconduct denied him a fair trial.
>
> {¶ 136} First, Braun alleges that the prosecutor failed to comply with his obligations
> under *Brady* and Crim.R. 16. We find no merit to this claim. As we stated under the first
> and third assignments of error, the prosecutor did not violate *Brady* or Crim.R. 16.
>
> {¶ 137} Second, Braun complains that the prosecutor intentionally placed irrelevant and
> prejudicial evidence before the jury when he examined Shear's mother, Sandy
> Seidenwand, and played portions of the taped conversations she had with Shear. As
> stated previously, the audiotapes are not included in the record on appeal. Any lack of
> diligence on the part of an appellant to secure a portion of the record necessary to his

---

[14] In Braun's petition for habeas relief he has only pursued seven of the eight alleged instances of prosecutorial
misconduct that he presented to the state appellate court. Braun has not pursued habeas relief on his prior claim that
the prosecutor improperly told the jury that they had only two options, life without any chance for parole or death.
Doc. 12-1, Ex. 24, p. 135.

appeal should inure to appellant's disadvantage rather than to the disadvantage of appellee. *State ex rel. Montgomery,* supra. Consequently, we find no prosecutorial misconduct.

{¶ 138} Third, Braun asserts that it was prosecutorial misconduct to introduce Stedman's journals on redirect examination. We addressed this issue in the fifth assignment of error, and found that the journals were admissible.

{¶ 139} Fourth, Braun complains about the other acts evidence that was admitted. We addressed this argument in Braun's sixth assignment of error, finding that some of the acts were inadmissible; however, we found the error to be harmless since Braun took the stand and testified to a whole litany of criminal activity.

{¶ 140} Fifth, Braun alleges that it was improper for the prosecutor to elicit testimony regarding the anonymous tip to Crime Stoppers that Braun was responsible for the victim's murder. The record indicates that Braun's objection was sustained and the jury was told to disregard the testimony. Jurors are presumed to follow the instructions of the court, and Braun offers no evidence that the jury failed to abide by the trial court's instruction. See *State v. Charley,* Cuyahoga App. No. 82944, 2004-Ohio-3463. Even if the prosecutor's question was improper, we cannot say that Braun did not have a fair trial.

{¶141} Braun also contends that the state improperly attempted to introduce evidence that Shear made an oral "proffer" to the police blaming Braun for the killing.  The record reveals that at a sidebar discussion the prosecutor followed the ruling.

{¶ 142} Braun's sixth contention is that the prosecutor repeatedly belittled and mocked Braun in front of the jury for asserting his constitutional right to assist in his own defense. Cross-examination is "permitted on all relevant matters and matters affecting credibility." *State v. Slagle* (1992), 65 Ohio St.3d 597, 605, 605 N.E.2d 916, quoting Evid.R. 611(B). The scope of cross-examination lies within the sound discretion of the trial court in relation to the particular facts of the case. *Id.* A review of the transcript does not support Braun's contention that the prosecutor mocked and belittled Braun. We find the cross-examination of Braun to be consistent with the particular facts of the case.

{¶ 143} Next, Braun alleges that the prosecutor made numerous prejudicial and improper comments during closing argument and the guilt phase. He complains that the prosecutor argued that the crime against Tom McDonald was "corroborative of the deed, the evil deed that was done to Mr. Chappell." A review of the record indicates that this statement is taken out of context, and the actual statement by the prosecutor was not improper.

{¶ 144} Braun alleges that the prosecutor attempted to shift the burden of proof to the defense by stating that the defense has subpoena power, too. In *State v. Clemons,* 82 Ohio St.3d 438, 452, 696 N.E.2d 1009, 1998-Ohio-406, the Ohio Supreme Court recognized that the prosecution is entitled to comment on defense counsel's failure to offer evidence or to call witnesses other than the defendant. Accordingly, the prosecutor's statements were not improper.

{¶ 145} Braun points out that in closing argument the prosecutor called the defense attorney "underhanded." Braun's attorney objected, and the court sustained the objection. Although the comment was improper, we do not find that the comment denied Braun a fair trial.

{¶ 146} Braun complains that the prosecutor improperly vouched for its witness Quarrick, as well as the investigation by the police. The record does not support Braun's contention that the prosecutor vouched for the credibility of the witness or the police investigation.

{¶ 147} Braun also asserts that the prosecutor "got into the defendant's face" at the end of closing argument in an improper and offensive way. The record reveals that Braun's attorney objected to the prosecutor "getting in the defendant's face"; the court overruled the objection. The Ohio Supreme Court has held that the prosecution is entitled to some latitude and freedom of expression in closing arguments, but cannot deliberately saturate the trial with emotion. *State v. Keenan* (1993), 66 Ohio St.3d 402, 613 N.E.2d 203. We cannot say that the prosecutor's action denied Braun a fair trial.

*State v. Braun*, 2009-Ohio-4875 (Ohio Ct. App. Sept. 17, 2009).

Habeas relief is only proper where prosecutorial misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). The Sixth Circuit has adopted a two-step approach for determining whether prosecutorial misconduct violates a defendant's due process rights. *United States v. Carter*, 236 F.3d 777, 783 (6th Cir. 2001). *See also, Boyle v. Million*, 201 F.3d 711, 717 (6th Cir. 2000) (utilizing this test to evaluate a due process claim based upon prosecutorial misconduct raised in a post-AEDPA habeas petition). The first step is to decide whether the prosecutor's conduct was improper. *Macias v. Makowski*, 291 F.3d 447, 452 (6th Cir. 2002). If improper, the second step is to determine whether the impropriety was flagrant, and thus violated the defendant's due process rights. *Id.*

**Improper Conduct Analysis.** The appellate court acknowledged that the prosecutor acted improperly in two of the seven instances alleged in Braun's habeas petition, i.e., No. 4, the

presentation of other acts evidence and No. 7, conduct during closing argument. Doc. 12-1, Ex. 29, pp. 261-265. Accordingly, it will be assumed for purposes of this review that those acts were indeed improper and they will be subjected to the flagrancy analysis below. As to the other four instances (Nos. 1-3, 5 & 6), Braun fails to show how the Eighth District decision, finding no prosecutorial misconduct, was contrary to, or an unreasonable application of federal law.

With regard to Nos. 1 & 3 (Braun's allegations that the prosecutor failed to comply with *Brady* and improperly introduced the Stedman journal), those instances are procedurally defaulted and/or without merit, as discussed above in relation to Grounds Two (A) and (C).

With regard to No. 2, the audiotaped authentication issue, the appellate court did not consider this claim due to Braun's failure to provide the appellate court with the tapes. *State v. Braun*, 2009-Ohio-4875, ¶137 (Ohio Ct. App. Sept. 17, 2009). A petitioner procedurally defaults a claim if he fails "to comply with the state procedural rules in presenting his claim to the appropriate state court." *Williams*, 460 F.3d at 806. Braun failed to comply with the state procedural rule which provides "where a transcript of any proceeding is necessary for disposition of any question on appeal, the appellant bears the burden of taking steps required to have the transcript prepared for inclusion in the record. *Knapp v. Edwards Laboratories* (1980), 61 Ohio St.2d 197, 15 O.O.3d 218, 400 N.E.2d 384. Accordingly, this instance is procedurally defaulted.

With regard to No. 5, Braun alleged that the prosecutor introduced evidence of a Crime Stoppers tip and evidence that John Shear made a proffer to the police blaming Braun for the killing. Braun objected to the testimony regarding the Crime Stoppers tip and the jury was told to disregard the testimony. Jurors are presumed to follow the instructions of the court, and Braun offers no evidence that the jury failed to abide by the trial court's instruction. *See State v.*

*Charley,* Cuyahoga App. No. 82944, 2004-Ohio-3463. Even if the prosecutor's question was improper, it cannot be said that the question denied Braun a fair trial.  Doc. 12-1, Ex. 29, p. 263.

With regard to No. 6, the allegation that the prosecutor belittled and mocked Braun for asserting his constitutional rights, the appellate court found that a review of the transcript did not support Braun's contention that the prosecutor mocked or belittled Braun and that cross-examination is permitted on all relevant matters and matters affecting credibility.  Doc. 12-1, Ex. 24, ¶ 142.  The trial transcript reflects that Braun said, in the presence of the jury, that his constitutional rights were being violated after the trial court denied him the right to personally view witness statements.  Doc. 12-2, p. 2452.  When Braun took the stand the Prosecutor questioned him about what he meant by this statement.  Doc. 12-2, p. 2452-2453.  Braun replied that, "the Constitution says that anyone makes a statement against you, you have a right to look at that statement, see it, and to ask questions against it.  And the judge in this case has refused me to look at any of those statements."  Doc. 12-2, p. 2453.  The prosecutor then pointed out that Braun's lawyers had access to the statements.  Doc. 12-2, p. 2453.  Braun argued that the Constitution requires that he also be able to view the statements.  Doc. 12-2, p. 2454.  The prosecutor asked Braun to explain this and then moved on.  Doc. 12-2, p. 2452-56.  Based on the above and consistent with the findings of the appellate court, the undersigned finds that Braun's contention that he was "mocked or belittled" with regard to his constitutional rights is without merit.

Because Braun has not shown that the state court's conclusion that instances number 1, 2, 3, 5, and 6 were not improper was contrary to or an unreasonable application of federal law, a flagrancy analysis will not be performed with respect to them.  *United States v. Carroll*, 26 F.3d at 1383-90.

**Flagrancy Analysis**.  The Eighth District found improper prosecutorial conduct with respect to instances 4 and 7.  With respect to Issue 4, the Eighth District found that some of the other acts evidence was not admissible.  Doc. 12-1, Ex. 29, 262.  Specifically the Eighth District found that the following "other acts" were improperly admitted:  Braun's alleged involvement in (i) the theft of a Corvette and $40,000 from a 53-year-old woman; (ii) a murder and robbery at the Peanut Bar; and (iii) in shooting up a house.  Doc. 12-1, Ex. 29, pp. 247-48.  With respect to issue 7, the Eighth District found that it was improper for the prosecutor to "g[et] into the defendant's face" and to call the defense attorney "underhanded" during closing argument.  Doc. 12-1, Ex. 29, 264.

The flagrancy determination involves a four-factor test (1) whether the conduct and remarks of the prosecutor tended to mislead the jury or prejudice the defendant, (2) whether the conduct or remarks were isolated or extensive, (3) whether the remarks were deliberately or accidentally made; and (4) whether the evidence against the defendant was strong.  *United States v. Carroll*, 26 F.3d at 1383-90. The prosecutor's conduct in this case was not flagrant because it was not likely to mislead the jury or prejudice Braun since he took the stand and admitted to a whole litany of criminal activity, including promoting prostitution, robbery, drug trafficking, car theft, drug use, as well as his fear that he was going to be indicted for the Peanut Bar murder and the murder of a girl on Denison Avenue.  Doc. 12-1, Ex. 29, p.248.  Based on the totality of the evidence, the case against Braun was strong.  The closing statement issues were isolated, as was the other acts evidence presented through Stedman's journals.  *Carroll*, 26 F.3d at 1383-90.

For the foregoing reasons, Braun is not entitled to habeas relief on Ground Two (H).

### 8.   Ground Two (I) is without merit

In Ground Two (I), Braun asserts that the cumulative effect of the seven trial errors identified by the Eighth District Court of Appeals render his trial fundamentally unfair.  Doc. 47, p.79-80.  The seven trial errors recognized by the state appellate court include:  (i) Four instances of "other acts" evidence which were inadmissible; (ii) the prosecutor calling the defense counsel "underhanded" in closing statements; (iii) the improper admission of co-defendant Shear's testimony through two different witnesses – Daniel Quarrick and Angie Casto.  Doc. 47, pp. 79-80.  Braun presented this subclaim on direct appeal to the Eighth District Court of Appeals in his fourteenth assignment of error (Doc. 12-1, Ex. 24, p.138) and to the Ohio Supreme Court in his fourteenth proposition of law (Doc. 12-1, Ex. 31, p. 293-294).

The Supreme Court has not held that constitutional claims that would not individually support habeas relief may be cumulated in order to support relief. See *Lorraine v. Coyle,* 291 F.3d 416, 447 (6th Cir.2002); *Scott v. Elo,* 302 F.3d 598, 607 (6th Cir.2002).  Thus, it cannot be said that the judgment of the Ohio courts rejecting Braun's cumulative effect argument is contrary to any Supreme Court decision so as to warrant relief under the AEDPA. *Tolliver v. Sheets*, 530 F. Supp. 2d 957, 1002-03 (S.D. Ohio 2008) *aff'd,* 594 F.3d 900 (6th Cir. 2010).  *Cf. Walker v. Engle,* 703 F.2d 959, 963 (6th Cir.1983) (pre-AEDPA case; holding that "[e]rrors that might not be so prejudicial as to amount to a deprivation of due process when considered alone, may cumulatively produce a trial setting that is fundamentally unfair").  Accordingly, Ground Two (I) is without merit.

### D.  Ground Three

In Ground Three, Braun argues that his trial counsel was constitutionally ineffective in five respects:

A.  The denial of a continuance after the state revealed exculpatory evidence rendered Braun's counsel ineffective; Doc. 47, p.85.

B.  Defense counsel rendered ineffective assistance of counsel for failing to investigate Stephen Lenchak or James Reardon; Doc. 47, p.87.

C.  The Trial Court's refusal to allow Braun to review any written witness statements rendered defense counsel ineffective; Doc. 47, p.89.

D.  The Trial Court's order that any witness statement referred to by defense on cross-examination would be submitted in its entirety rendered defense counsel ineffective; Doc. 47, p. 91.

E.  Braun was provided ineffective assistance of counsel by failing to call Bobby Mechling as a witness at trial.  Doc. 47, p.94.

**1.  Grounds Three (B) and (E) are procedurally defaulted**

Respondent argues that Grounds Three (B) and (E) are procedurally defaulted because they were not fairly presented to the state court as a constitutional violation.  Doc. 52, p.38.  Petitioner concedes that these ineffective assistance of counsel claims were not fairly presented to the Ohio courts.  Doc. 54, p.69.  He argues that cause and prejudice excuse his procedural default.  Doc. 54, p.69.  More specifically, he argues that his post-conviction counsel was ineffective because he did not recognize an error made by counsel on Braun's direct appeal.  Doc. 54, p.72.  Braun states that "[u]nder *Martinez*, the ineffectiveness of post-conviction counsel can excuse any procedural default."  Doc. 54, p.72.  However, Braun misstates *Martinez*[15] and *Martinez* is inapplicable to this case.  As explained by the Sixth Circuit:

"In *Martinez,* the Supreme Court "narrow[ly]" answered a "precise question": "whether ineffective assistance in an initial-review collateral proceeding on a claim of ineffective assistance at trial may provide cause for a procedural default in a federal habeas proceeding." 132 S.Ct. at 1315. The Court carefully defined "initial review collateral proceeding" to mean state court proceedings that, by operation of state law, "provide the first occasion to raise a claim of ineffective assistance of counsel" because the state "barred the defendant from raising the claim on direct appeal." *Id.* at 1315, 1320. The Court concluded that, in that circumstance, inadequate assistance of *collateral* counsel may constitute cause to excuse the

---

[15]*Martinez v. Ryan*, 132 S. Ct. 1309, 182 L. Ed. 2d 272 (2012).

procedural default of an ineffective assistance of *trial* counsel claim, thus allowing federal
courts to look past the default on habeas review and at the merits of the claim. *Id.* at 1320.
But the Court repeatedly emphasized the "limited nature" of its holding, which "addresse[d]
only the constitutional claims" present where the state has banned a defendant from raising
his ineffective assistance of trial counsel claim on direct appeal. *Id.*

We respect *Martinez's* emphasis that its conclusion was a narrow one and join our sister
circuits in refusing to expand it. *See, e.g., Ibarra v. Thaler,* 687 F.3d 222, 224 (5th Cir.2012);
*Arnold v. Dormire,* 675 F.3d 1082, 1087 (8th Cir.2012); *Banks v. Workman,* 692 F.3d 1133,
1148 (10th Cir.2012).

*Moore v. Mitchell*, 708 F.3d 760, 784-85 (6th Cir. 2013).  Ohio permits ineffective assistance of

trial counsel claims to be made on direct appeal.  *Moore,* 689 N.E.2d at 13–14.  In fact, Braun

raised a claim of ineffective assistance of counsel on direct appeal.  Doc. 12-1, Ex. 24, pp. 133-

34.  The only reason Braun's ineffective assistance of counsel claim was not reviewed on the

merits is because it lacked the specificity required by App. R. 12(A)(2). Since the state court

rejected Braun's claim on procedural grounds, that claim is barred in federal court. Doc. 12-1,

Ex. 29, p. 266.  *Wainwright v. Sykes,* 433 U.S. 72, 82–84, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977).

Accordingly, Grounds Three (B) and (E) are procedurally defaulted.

### 2.   Grounds Three (A), (C), and (D) are without merit

Ineffective assistance of counsel claims typically allege specific errors that counsel made

in the course of a legal proceeding. *Flores-Ortega,* 528 U.S. at 482, 120 S.Ct. 1029. A defendant

can also raise an ineffective assistance claim when "during the judicial proceeding [the

defendant] was either actually or constructively denied the assistance of counsel altogether." *Id.*

at 483, 120 S.Ct. 1029.  In three of Braun's five subclaims Grounds Three (A), (C), and (D),

Braun argues that he was constructively denied the assistance of counsel by the trial judge's

rulings. However, these arguments are without merit.

First, Braun's arguments fall of their own weight since his underlying arguments have

been rejected, i.e., the undersigned has recommended that Braun be denied relief on his due

process claims relating to the denial of a continuance, the trial court's refusal to allow Braun to personally view the written witness statements, and the trial court's order that any witness statements referred to by the defense be submitted in their entirety.  In sum, if the trial court's rulings were constitutionally permissible, then Braun's right to effective assistance of counsel was not denied based on those rulings.  *See Lakeside v. Oregon, 435 U.S. 333, 341, 98 S. Ct. 1091, 1096, 55 L. Ed. 2d 319 (1978).*

In *Lakeside*, the U.S. Supreme Court addressed a similar argument.  In that case, the petitioner argued that his constitutional right to counsel was violated when the trial judge refused his lawyer's requested jury instruction.  *Lakeside v. Oregon,* 435 U.S. 333, 341, 98 S. Ct. 1091, 1096, 55 L. Ed. 2d 319 (1978).  The Supreme Court rejected the petitioner's argument stating:

> "To hold otherwise would mean that the constitutional right to counsel would be implicated in almost every wholly permissible ruling of a trial judge, if it is made over the objection of the defendant's lawyer.
> In an adversary system of criminal justice, there is no right more essential than the right to assistance of counsel. But that right has never been understood to confer upon defense counsel the power to veto the wholly permissible actions of the trial judge. It is the judge, not counsel, who has the ultimate responsibility for the conduct of a fair and lawful trial."

*Lakeside, 435 U.S. at 341-342.* Accordingly, Grounds Three (A), (C), and (D) are without merit.

**E.  Ground Four**

In Ground Four, Braun cites three instances where he claims the trial court violated his rights under the Confrontation Clause of the Sixth Amendment as including:

- Ground Four (A):  The trial court's improper admission of co-defendant John Shear's statements at trial

- Ground Four (B):  The trial court's refusal to allow Braun to personally review witness statements.

- Ground Four (C):  The trial court's ruling that any witness statement would automatically be submitted into evidence if defense referred to the statement on cross-examination.

Doc. 47, pp.96-106.  Braun presented Ground Four (A) on direct appeal to the Eighth District

Court of Appeals in his seventh assignment of error (Doc. 12-1, Ex. 24, p.127) and to the Ohio

Supreme Court in his seventh proposition of law (Doc. 12-1, Ex. 31, p. 289).   He presented

Grounds Four (B) and (C) on direct appeal to the Eighth District Court of Appeals in his tenth

assignment of error (Doc. 12-1, Ex. 24, p.132) and to the Ohio Supreme Court in his tenth

proposition of law (Doc. 12-1, Ex. 31, p.291).

### 1.   Ground Four (A) is  without merit and a portion of Ground Four (A) is procedurally defaulted

In Ground Four (A) Braun asserts that he was denied his right of confrontation when co-

defendant Shear's out-of-court statements were admitted at trial through the testimony of State

witnesses Michael Graham, Daniel Quarrick, and Angie Casto.  Doc. 47, pp.96-97.  The Eighth

District Court of Appeals rejected this claim on direct appeal, stating the following.

{¶ 105} Braun argues that statements attributed to his co-defendant Shear were inadmissible because the state failed to present competent independent proof of a conspiracy, and that the statements were testimonial and thus violated his right to confront witnesses against him. Specifically, he complains about the statements made by Shear regarding Shear's efforts to manipulate Michael Graham's testimony by having him assaulted in prison, statements made by Shear to his mother discussing the crime and his efforts to cover it up,[16] statements made by Shear to inmate Daniel Quarrick bragging about the murder he and Braun committed, and statements made by Shear to his then-girlfriend Angie Casto, blaming Braun for the killing but telling her he helped Braun dispose of the body and requesting her to be his alibi.

{¶ 106} The state argues that all statements were admissible as statements by a co-conspirator pursuant to Evid.R. 801(D)(2)(e). Under Evid.R. 801(D)(2)(e) a statement is not hearsay if the statement is offered against a party and is a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy upon independent proof of the conspiracy.

{¶ 107} The statement of a co-conspirator is not admissible until the proponent of the statement has made a prima facie showing of the existence of the conspiracy by independent proof. *State v. Smith,* 87 Ohio St.3d 424, 434, 721 N.E.2d 93, 2000-Ohio-450, citing *State v. Carter* (1995), 72 Ohio St.3d 545, 651 N.E.2d 965, paragraph three of the syllabus. A prima facie case is made where the evidence introduced is sufficient to support, but not compel, a

---

[16] The appellate court noted that "most of the statements made by Shear to his mother were taped conversations, which are not in the appellate record."  Doc. 12-1, Ex. 29, p. 294.

particular conclusion, and which only furnishes evidence that the jury may consider and weigh, but need not accept. *State v. Martin* (1983), 9 Ohio App.3d 150, 458 N.E.2d 898, citing *Cleveland v. Keah* (1952), 157 Ohio St. 331, 105 N.E.2d 402.

{¶ 108} The proponent of the statement must establish: (1) the existence of a conspiracy; (2) the defendant's participation in the conspiracy; (3) the declarant's participation in conspiracy; (4) that the statement was made during the course of the conspiracy; and (5) that the statement was in furtherance of the conspiracy. *State v. Milo* (1982), 6 Ohio App.3d 19, 451 N.E.2d 1253.

{¶ 109} A conspiracy does not necessarily end with the commission of the crime. *State v. Siller,* Cuyahoga App. No. 80219, 2003-Ohio-1948. A statement made by a co-conspirator after the crime may be admissible under Evid.R. 801(D)(2)(e) if it was made in an effort to conceal the crime. *Id.*

{¶ 110} A review of the record confirms that the state set forth a prima facie case, by independent proof, of the conspiracy between Braun and Shear. State's witness Michael Graham testified that Braun and Shear were together on the night of the murder at Dave Essenberg's house on Storer Avenue. Graham testified that Braun and Shear pressured Graham to get gasoline for them, claiming that their car was out of gas. Graham went to the gas station and bought gasoline for them. He testified that when he returned with the gasoline, Braun and Shear were in a hurry and anxious to get out of there. They left with the gasoline. Later that evening, Graham saw Braun driving the victim's Blazer down the alley by Essenberg's house with Shear following behind in Graham's vehicle. The victim was later found in the Blazer.

{¶ 111} Graham also testified that the next day, Shear and Braun were at Essenberg's house. Graham testified that Braun told Shear that they should shoot Essenberg because he would "run his mouth" and get them "knocked." We find that the state set forth sufficient independent evidence of the conspiracy between Braun and Shear that continued well after the crime itself.

{¶ 112} We find that the testimony regarding Shear's efforts to manipulate or stop Michael Graham from cooperating with the state constituted admissible co-conspirator statements made in furtherance of the conspiracy. As for the statements made by Shear to his mother, unfortunately, we cannot review the statements in their entirety because the audiotapes were not included in the record on appeal. Any lack of diligence on the part of an appellant to secure a portion of the record necessary to his appeal should inure to appellant's disadvantage rather than to the disadvantage of appellee. *State ex rel. Montgomery v. R & D Chemical Company* (1995), 72 Ohio St.3d 202, 648 N.E.2d 821. When portions of the transcript, or in this case, the audiotapes, are not part of the record, the appellate court must presume regularity in the decision below. *State v. Farris,* Cuyahoga App. No. 84795, 2005-Ohio-1749.

{¶ 113} As for Shear's statements to Quarrick bragging about the murder, we find that the statements were not made in furtherance of the conspiracy, and thus inadmissible.

49

Nevertheless, we find the admission to be harmless due to the timing of the witness. Quarrick was the 22nd witness out of 32 witnesses that testified for the state during its case-in-chief. At that point, there was an abundant amount of evidence of Braun's guilt, and this was merely cumulative evidence. See *State v. Smith,* 87 Ohio St.3d 421, 2000-Ohio-450 (finding co-conspirators' statements bragging about the murder to be harmless error because of the timing of the witness's testimony and the other evidence of defendant's guilt).

{¶ 114} Regarding Shear's statements to his then girlfriend Angie Casto, we find his statements requesting her to be an alibi witness were in furtherance of the conspiracy, and thus admissible under Evid.R. 801(D)(2)(e). As for the statements by Shear blaming Braun for the murder, we find those statements were not in furtherance of the conspiracy, and thus inadmissible. Again, however, we find the admission to be harmless in light of the overwhelming evidence of Braun's guilt presented prior to Angie Casto taking the stand. She was the 23rd witness.

{¶ 115} Further, we find no merit to Braun's argument that the admission of Shear's statements violated his confrontation rights. The Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him." In *Crawford v. Washington* (2004), 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177, the Supreme Court announced a new standard for assessing whether hearsay statements, otherwise admissible under principles of evidence, violate the mandate of the Confrontation Clause. Under this rule, "[w]here testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is * * * confrontation." 541 U.S. at 68-69, 124 S.Ct. 1354, 158 L.Ed.2d 177. The proper inquiry is "whether a reasonable person in the declarant's position would anticipate his statement being used against the accused in investigating and prosecuting the crime." *United States v. Cromer* (C.A.6, 2004), 389 F.3d 662, 675.

{¶ 116} Here, the statements were admitted into evidence under the theory that they were statements made by a co-conspirator in furtherance of the conspiracy, which are not hearsay statements. See Evid.R. 801(D)(2)(e). Co-conspirator statements are inherently nontestimonial because the purpose for making the statements is not for later use at trial. See *United States v. Mooneyham* (C.A.6, 2007), 473 F.3d 280, 286 (applying *Crawford* to co-conspirator statements). By definition, such statements are not by their nature testimonial; the one making them has no "awareness or expectation that his or her statements may later be used at a trial." (Internal quotation omitted.) *Cromer,* 389 F.3d. at 674. Moreover, the *Crawford* court specifically identified statements in furtherance of a conspiracy as examples of statements that are inherently nontestimonial. See 541 U.S. at 51, 56, 124 S.Ct. 1354, 158 L.Ed.2d 177.

{¶ 117} After *Crawford,* nontestimonial statements continue to be analyzed with respect to the Confrontation Clause under the rule of *Ohio v. Roberts* (1980), 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597. See 541 U.S. at 68, 124 S.Ct. 1354, 158 L.Ed.2d 177; *United States v. Gibson* (C.A.6, 2005), 409 F.3d 325, 337-38 (noting that *Crawford* did not disturb the rule that nontestimonial statements are constitutionally admissible if they satisfy the *Roberts* standard). Under this rule, statements may be admitted in absence of cross-examination only

when they bear adequate indicia of reliability or when they fall within a "firmly rooted" exception to the hearsay rule. See *Roberts,* 448 U.S. at 66, 100 S.Ct. 2531, 65 L.Ed.2d 597; *Crawford,* 541 U.S. at 42, 124 S.Ct. 1354, 158 L.Ed.2d 177. Co-conspirator statements in furtherance of a conspiracy are both inherently trustworthy and "firmly rooted." "[T]he Confrontation Clause does not require a court to embark on an independent inquiry into the reliability of statements that satisfy the requirements of Rule 801(d)(2)(E)." *Bourjaily v. United States* (1987), 483 U.S. 171, 183-84, 107 S.Ct. 2775, 97 L.Ed.2d 144.

{¶ 118} In summary, we find that the admission of co-conspirator statements does not violate the Confrontation Clause. Further, we find that the state set forth a prima facie showing that a conspiracy existed between Braun and Shear. Finally, the statements that we found were made in furtherance of the conspiracy were admissible as nonhearsay statements pursuant to Evid.R. 801(D)(2)(e), and the remaining statements were improperly admitted but harmless. Accordingly, Braun's seventh assignment of error is overruled.

Doc. 12, Ex. 29, pp. 249-255. *State v. Braun*, 2009-Ohio-4875 (Ohio Ct. App. Sept. 17, 2009).

Under AEDPA, this Court's review of the Ohio Court of Appeals' decision in Braun's case is limited to whether the court correctly identified the "governing legal principle" and whether it "unreasonably applie[d] that principle to the facts of the prisoner's case." *Colon v. Taskey*, 414 Fed. Appx. 735, 737 (6th Cir. 2010) (quoting *Williams,* 529 U.S. at 413, 120 S.Ct. 1495). The Ohio court correctly identified *Crawford* as the governing law.  As stated by the appellate court, *Crawford* specifically cited statements in furtherance of a conspiracy as examples of statements that are inherently nontestimonial and, therefore, permissible under the Confrontation Clause. See 541 U.S. at 51, 56, 124 S.Ct. 1354, 158 L.Ed.2d 177.  Applying that law, the appellate court found that the statements made were in furtherance of a conspiracy between Braun and Shear.  Doc. 12, Ex. 29, p. 251.  Braun testified to taking part in such a conspiracy.  Doc. 12-2, pp. 2391-92.  The conspiracy exception to the hearsay rule applies only to declarations made while the conspiracy charged was still in progress.  *Anderson v. U. S.*, 417 U.S. 211, 218-19, 94 S. Ct. 2253, 2259-60, 41 L. Ed. 2d 20 (1974); *Krulewitch v.U.S.,* 336 U.S. 440, 69 S.Ct. 716, 93 Led. 790 (1949).  The statements admitted in this case satisfy the con-conspirator exception.

**Michael Graham.**  Braun argues that the statement Shear made to Graham the day after the Chappell murder that "[Chappell] was in the car" and that Shear got "into an argument over drugs…[Chappell] was shot, and they burned him up with gas" violated his constitutional right to confrontation.  Doc. 47, p. 97.  However, this is not the argument which Braun made to the state court of appeals.  In his appellate brief, Braun argued that, "[t]he improperly admitted statements [which violated his right to confrontation] include statements by or attributed to Shear *about his alleged efforts to manipulate State witness Michael Graham*."  Doc. 12-1, Ex. 24, p. 128 (emphasis added).  The statement which Braun now argues violated his right to confrontation (i.e. that Shear said Chappell was shot and they burned him up with gas) was not a statement about Shear's alleged efforts to manipulate Graham.  In order to satisfy the fair presentation requirement, a habeas petitioner must present both the factual and legal underpinnings of his claims to the state courts. *McMeans v. Brigano,* 228 F.3d 674, 681 (6th Cir.2000).  Braun did not present the same factual underpinnings of his claim to the state court and has not fairly presented this claim.  Braun is now procedurally barred from doing so and the portion of his claim which relates to Michael Graham's statement is procedurally defaulted.

**Daniel Quarrick and Angie Casto.**  The Eighth District found that the statements made to Daniel Quarrick and Angie Casto were not admissible because they were not made in furtherance of conspiracy.  However, the Eighth District found, and the undersigned agrees, that the admission of those statements was harmless error because, at the point Quarrick and Casto testified (22nd and 23rd out of 32 witnesses), there was already an abundance of evidence of Braun's guilt, and those statements were merely cumulative evidence. See *State v. Smith,* 87 Ohio St.3d 421, 2000-Ohio-450 (finding co-conspirators' statements bragging about the murder

to be harmless error because of the timing of the witness's testimony and the other evidence of defendant's guilt).

When conducting harmless error review in habeas, the Court must ask whether a petitioner has shown that the error had a substantial and injurious effect in determining the jury's verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993)*; Wilson v. Mitchell*, 498 F.3d 491, 503 (6th Cir. 2007).  Braun is not entitled to habeas relief based on the admission of the statements made to Quarrick and Casto because the state court of appeals correctly determined that the trial judge's error in admitting the statements from Quarrick and Casto did not have a "substantial and injurious effect" in determining the jury's verdict where those statements were merely cumulative to other evidence at trial.[17]

## 2. Grounds Four (B) & (C) are without merit

Braun asserts that he was denied his right to confrontation because he was not *personally* permitted to view witness statements (Ground Four (B)) and his defense counsel was not permitted to cross-examine witnesses about the statements without admitting the entirety of the statements into evidence.  Doc. 54, pp. 90-97.  The Eighth District found that the trial court did not err in either ruling.

Regarding the viewing of witness statements, the Eighth District held that, under Ohio Crim. R. 16(B)(1)(g), *counsel* for both parties must be given the opportunity to:  "(1) inspect the statement personally; and (2) call attention to any perceived inconsistencies between the testimony of the witness and the prior statement."  Doc. 12-1, Ex. 29, p. 260, quoting *State v. Hale*, 2119 Ohio St.3d 118, 2008-Ohio-3426.

---

[17] E.g., statements made by Graham discussed *supra*.  Kimberly Ferline testified that Braun asked her to be his alibi for the night of Chappell's murder and to get rid of a gun.  Doc. 12-1, Ex. 29, p. 220.  Shannon Holbert testified that she saw Braun the morning after the murder and he admitted to killing Chappell.  Doc. 12-2, pp. 1159-1162.

Braun's attorney was permitted to inspect the witness statements. Doc. 12-1, Ex. 29, p. 260. Braun cites no case law to support his position that permitting his counsel, but not him, to inspect the statements denied his federal right of confrontation. Braun only recites general propositions regarding the right to confront witnesses. Accordingly, Braun's argument is without merit.

With regard to the use of the witness statements for impeachment purposes, the Eighth District stated, "It has long been held that when a portion of a prior written statement is used to impeach a witness by showing an inconsistency with current testimony, the entire document may be admitted on rebuttal, to rehabilitate the witness." Doc. 12-1, Ex. 29, p. 261. Braun argues that he was prevented from impeaching the credibility of the witnesses by the trial court's ruling requiring the statements to be admitted in their entirety if a portion was used for impeachment. Doc. 47, pp. 105-06. However, Braun's argument is without merit because he was not prevented from using the witness statements to impeach the credibility of the witnesses. Braun provides no case law to support the proposition that admitting the full witness statement after use would hamper his ability to impeach the credibility of the witness or violate his federal right of confrontation. Accordingly, the Eighth District's ruling was not an unreasonable application of clearly established federal law and Braun is not entitled to habeas relief on Ground Four.

**F. Ground Five is without merit**

In Ground Five, Braun claims that his conviction was not supported by sufficient evidence and that the state appellate court made an unreasonable application of the standard set forth in *Jackson v. Virginia,* 443 U.S. 307 (1979). Doc. 47, p. 106. Braun presented a sufficiency of the evidence claim on direct appeal to the Eighth District Court of Appeals in his thirteenth

assignment of error (Doc. 12-1, Ex. 24, pp.136-137) and to the Ohio Supreme Court in his eleventh proposition of law (Doc. 12-1, Ex. 31, p. 293).

On federal habeas review, a state court's determination regarding a sufficiency of evidence claim is entitled to a "double layer" of deference. *Tucker v. Palmer*, 541 F.3d 652, 656 (6th Cir. 2008). The first layer of deference goes to the factfinder; the second goes to the state reviewing court as required by the AEDPA. *Id.* As explained in *Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009), deference is due to the jury's finding of guilt because the standard announced in *Jackson* is whether, "viewing the trial testimony and exhibits in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Brown v. Konteh*, 567 F.3d at 205. This standard "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from the basic facts to ultimate facts." *Jackson*, 443 at 319.

The second layer of deference goes to the state appellate court. Even if the federal habeas court believes that a rational trier of fact could not have found guilt beyond a reasonable doubt, a federal habeas court "must still defer to the state appellate court's sufficiency determination as long as it is not unreasonable." *Brown*, 567 F.3d at 205; *see also White v. Steele*, 602 F.3d 707, 710 (6th Cir. 2009). A claim that the evidence was constitutionally insufficient to support a conviction is a mixed question of law and fact. *Starr v. Mitchell*, 234 F.3d 1270, at *3 (6th Cir. 2000) (unpublished). Thus, "a writ of habeas corpus may be issued for evidence insufficiency only if the state court adjudication 'resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States,' 28 U.S.C. §2254(d)(1), or was based on

'an unreasonable determination of the facts in light of the evidence presented in the State court

proceeding,' 28 U.S.C. §2254(d)(2)." *Id.*

> In addressing Braun's sufficiency of the evidence claim, the Ohio Court of Appeals

applied the federal standard, through use of state law relying upon that standard, and stated:

> {¶ 152} When an appellate court reviews a record upon a sufficiency challenge, " 'the
> relevant inquiry is whether, after viewing the evidence in a light most favorable to the
> prosecution, any rational trier of fact could have found the essential elements of the crime
> proven beyond a reasonable doubt.' " *State v. Leonard,* 104 Ohio St.3d 54, 67, 818
> N.E.2d 229, 2004-Ohio-6235, quoting *State v. Jenks* (1991), 61 Ohio St.3d 259, 574
> N.E.2d 492, paragraph two of the syllabus.

*State v. Braun*, 2009-Ohio-4875 (Ohio Ct. App. Sept. 17, 2009).  The Ohio Court of Appeals

articulated the correct standard under *Jackson*.  In applying this standard, the appellate court

found the following:

> {¶ 155} We find that there was sufficient evidence that Braun committed these crimes.
> There was testimony that Braun and Shear were looking for gasoline on the night of the
> murder, and that Braun called the victim to bring Braun gas. The victim left Tracy
> Walsh's house to bring gas to Braun and never returned. Braun was seen driving the
> victim's Blazer down an alley with Shear following behind, after they had obtained gas
> from Michael Graham. Braun himself admitted to robbing drug dealers with Shear and
> that each of them carried a gun. After viewing the evidence in a light most favorable to
> the prosecution, we find that any rational trier of fact could have found the crimes proved
> beyond a reasonable doubt.

> {¶ 156} The record reflects that most of the state's lay witnesses were drug users, felons,
> and jailhouse snitches. Nevertheless, credibility issues are within the province of the jury.
> In *State v. Golden* (Dec. 20, 2001), Franklin App. No. 01AP-367, the defendant argued
> his conviction was against the manifest weight of the evidence, as the witnesses were
> either on drugs or intoxicated at the time of the incident. In affirming, the court found
> "the jury was able to observe these witnesses and determine whether they were
> believable," and concluded "assessment of credibility was within the province of the trier
> of fact." *Id* .

> {¶ 157} "The jury was free to believe all, part, or none of the testimony of each witness."
> *State v. Colvin,* Franklin App. No. 04AP-421, 2005-Ohio-1448, at ¶ 34. Moreover, an
> appellate court may not substitute its judgment for that of the trier of fact on the issue of
> witness credibility unless it is manifestly clear that the fact-finder lost its way. *State v.
> Green,* Franklin App. No. 03AP-813, 2004-Ohio-3697, at ¶ 25. See, also, *State v.
> Covington,* Franklin App. No. 02AP-245, 2002-Ohio-7037, at ¶ 28.

*State v. Braun*, 2009-Ohio-4875 (Ohio Ct. App. Sept. 17, 2009).

Based on the above, the Ohio Court of Appeals reasonably applied the *Jackson* standard. The *Jackson* standard is not whether the trier of fact made the correct guilt or innocence determination but, rather, whether it made a rational decision to convict or acquit. *Herrera v. Collins*, 506 U.S. 390, 402 (1993). In making this determination, a court does not reweigh the evidence or redetermine the credibility of the witnesses. *Matthews v. Abramajtys,* 319 F.3d 780, 788 (6th Cir. 2003). In addition, circumstantial evidence alone may be sufficient to support a conviction. *Newman v. Metrish*, 543 F.3d 793, 796 (6th Cir. 2008) (internal citation omitted). In considering a sufficiency claim, "circumstantial evidence is entitled to equal weight as direct evidence." *Durr v. Mitchell*, 487 F.3d 423, 449 (6th Cir. 2007). There was sufficient evidence for the trier of fact to make a rational decision to convict Braun for these crimes.

Braun has failed to demonstrate that the appellate court's decision is contrary to or an unreasonable application of this clearly established federal law, or is based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, for the foregoing reasons, Braun should be denied federal habeas relief on Ground Five.

### G. Ground 6 is procedurally defaulted

#### 1. Braun's claim for relief arising from his post-trial proceeding is procedurally defaulted

In Ground Six, Braun claims his right to due process of law was violated during the post-trial proceedings relative to his motion for new trial. Doc. 47, p. 107. Specifically, Braun argues his due process rights were violated because (1) the state courts declined to grant him a new trial

based on Roy Fitzer's admission to the murder of Chappell; and (2) the state presented false and misleading testimony[18] relating to Fitzer at trial.  Doc. 47, pp. 107, 118-125.

Respondent argues, and this Court agrees, that Braun's Ground Six is procedurally defaulted.  First, Braun did not present the factual or legal basis of a due process violation based on false and misleading testimony either at the trial or appellate level.  See Doc. 12-1, Ex. 34, 42.  Second, with regard to Braun's claim of actual innocence based on Fitzer's admission to the murder, Braun presented the factual predicate of his actual innocence claim to the trial court and the Eighth District Court of Appeals.  Doc. 12-1, Ex. 34, 42.  However, Braun did not present the legal basis for a claim of a due process violation.

Braun filed a motion for new trial under Ohio Criminal Rule 33(A)(6), with the assistance of Ohio Public Defender Craig Jaquith.  Doc. 12-1, Ex. 34, p. 365.  In his motion, Braun argued that Roy Fitzer's affidavit and prospective testimony constituted new evidence which supported granting a new trial.  Doc. 12, Ex. 34, p. 369.  On February 9, 2010, the trial court held an evidentiary hearing on this issue.  Doc. 12-3.  At the hearing Braun presented only one witness, Roy Fitzer.  Doc. 12-3.  Fitzer testified that he alone shot Chappell and set him on fire.  Doc. 12-1, Ex. 44, p.458.  On May 12, 2010, the trial court issued an order denying Braun's motion for new trial.  Doc. 12-1, Ex. 41, p. 393.

Braun appealed the denial of his motion for new trial to the Eighth District Court of Appeals, which subsequently affirmed the trial court's ruling.  Doc. 12-1, Ex. 44, pp. 445-460.  On appeal, Braun argued that the trial court's denial of his motion for new trial was arbitrary and unreasonable under standards interpreting Ohio Crim. R. 33.  Doc. 12-1, Ex. 42, p. 418.  Braun

---

[18] Braun argues that, during the trial, the state represented that Fitzer was a co-conspirator who proffered against Braun and who would be presented as a witness to inculpate Braun.  Doc. 47, p. 123.

admits that, "at no point during Mr. Braun's litigation for a new trial was any 'federal claim' ever raised." Doc. 47, p. 117.

In order to satisfy the fair presentation requirement, a habeas petitioner must present both the factual and legal underpinnings of his claims to the state courts. *McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000).  This means that the petitioner must present his claims to the state courts as federal constitutional issues and not merely as issues arising under state law. *See, e.g.*, *Franklin v. Rose*, 811 F.2d 322, 325 (6th Cir. 1987); *Prather v. Rees*, 822 F.2d 1418, 1421 (6th Cir. 1987).  Braun did not present all of the factual and legal underpinnings of his Ground Six claim to the state courts.  Braun did not present either the factual or legal underpinnings of his claim that false and misleading testimony violated his right to due process and Braun did not present the legal underpinnings of his actual innocence claim based on due process of law.

A state defendant with federal constitutional claims must fairly present those claims to the state courts before raising them in a federal habeas corpus action. 28 U.S.C. § 2254(b), (c); *Anderson v. Harless*, 459 U.S. 4, 6  (1982) (per curiam); *Picard v. Connor*, 404 U.S. 270, 275–76 (1971); *see also Fulcher v. Motley*, 444 F.3d 791, 798 (6th Cir. 2006) (quoting *Newton v. Million*, 349 F.3d 873, 877 (6th Cir. 2003)) ("[f]ederal courts do not have jurisdiction to consider a claim in a habeas petition that was not 'fairly presented' to the state courts").  Braun did not fairly present Ground Six to the state courts.  As Braun did not fairly present Ground Six to the state courts during the litigation of his motion for new trial, Braun is now barred from doing so in his federal habeas corpus action. *See, e.g., Newton v. Million*, 349 F.3d 873, 877 (6th Cir. 2003)) ("[f]ederal courts do not have jurisdiction to consider a claim in a habeas petition that was not 'fairly presented' to the state courts"); *Martin v. Mitchell,* 280 F.3d 594, 603 (6th Cir. 2002) (if petitioner has failed to fairly present federal claims to the state courts and a state procedural

rule now prohibits the state court from considering them, the claims are considered procedurally defaulted).  Where state court remedies are no longer available, procedural default rather than exhaustion applies.  *Williams,* 460 F.3d at 806.  Accordingly, Braun's Ground Six is procedurally defaulted.

Alternatively, even if Ground Six were deemed to have been fairly presented as a constitutional claim, the claim would still be procedurally defaulted because Braun admits he failed to appeal the Eighth District's ruling to the Ohio Supreme Court.  Doc. 47, pp. 105-106.  A constitutional claim for relief must be presented to the state's highest court in order to satisfy the fair presentation requirement.  *See O'Sullivan v. Boerckel*, 526 U.S. 838, 845-48 (1999); *Hafley v. Sowders*, 902 F.2d 480, 483 (6th Cir. 1990).  "The federal court will not review claims that were not entertained by the state court either due to the petitioner's failure to raise those claims in the state courts while state remedies were available or when the petitioner's failure to comply with a state procedural rule prevented the state courts from reaching the merits of the claims." *Smith v. State of Ohio Department of Rehabilitation & Corrections,* 463 F.3d 426, 430–31 (6th Cir.2006); *Gunner v. Welch*, 3:09CV03009, 2013 WL 774154 (N.D. Ohio Feb. 28, 2013). Accordingly, Ground Six is procedurally defaulted.

Braun argues cause and prejudice to excuse default from both his failure to raise any constitutional claims during the pendency of his motion for new trial and for failure to appeal the Eighth District Courts decision affirming the denial of his motion or new trial.  Doc. 54, pp. 9-13.  Braun also argues that his claim of actual innocence excuses his procedural default.   Doc. 54, pp. 13-21.

### 2. Braun's ineffective assistance of counsel claim does not excuse his procedural default

The United States Supreme Court has "clearly expressed the view that a habeas petitioner must satisfy the 'cause and prejudice' standard before his procedurally defaulted ineffective-assistance claim will excuse the default of another claim." *Edwards v. Carpenter,* 529 U.S. 446, 452 n. 3, 120 S.Ct. 1587, 146 L.Ed.2d 518 (2000) (citing *Stewart v. LaGrand,* 526 U.S. 115, 120, 119 S.Ct. 1018, 143 L.Ed.2d 196 (1999)). "[P]etitioner has the burden of showing cause and prejudice to overcome a procedural default." *Hinkle v. Randle,* 271 F.3d 239, 245 (6th Cir.2001), citing *Lucas v. O'Dea,* 179 F.3d 412, 418 (6th Cir.1999)(internal citation omitted).  Inadequate counsel can prove cause, only if counsel's conduct violates Sixth Amendment standards and counsel's inadequate conduct has been presented to the state courts. *Fenton v. Colson,* 3:09-1057, 2013 WL 704317 (M.D. Tenn. Feb. 25, 2013).

The Supreme Court has explained that a claim of ineffective assistance must be presented to the state courts as an independent claim before it may be used to establish cause for a procedural default. *Murray v. Carrier,* 477 U.S. 478, 488–89, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986) (internal citation omitted); *Edwards v. Carpenter,* 529 U.S. 446, 452–53, 120 S.Ct. 1587, 146 L.Ed.2d 518 (2000) (finding that ineffective assistance of counsel cannot serve as cause to excuse a procedural default if that claim itself has been procedurally defaulted); *Taylor v. McKee,* 649 F.3d 446, 451 (6th Cir. 2011).  Braun's claim of ineffective assistance of post-conviction counsel was not presented to the state courts as an independent claim and is procedurally barred.  Moreover, 28 U.S.C. § 2254(i) bars a claim of ineffective assistance of post-conviction counsel as a separate ground of habeas relief. *Hodges v. Colson,* 727 F.3d 517, 531 (6th Cir. 2013).

Braun argues that failure to file an appeal with the Ohio Supreme Court does not prevent this Court from hearing his claim due to ineffective assistance of post-conviction counsel consistent with *Martinez*. Doc. 47, p. 114. However, ineffective assistance of post-conviction counsel does not constitute cause for a procedural default in a proceeding where petitioner is not constitutionally entitled to counsel. *Wainwright v. Torna,* 455 U.S. 586, 587–88, 102 S.Ct. 1300, 71 L.Ed.2d 475 (1982) ( a prisoner may not be deprived of the effective assistance of counsel, as a constitutional matter, in a proceeding where the prisoner has no constitutional right to counsel in the first place). A prisoner's entitlement under the Constitution to court-appointed counsel extends to "the first appeal of right, and no further." *Pennsylvania v. Finley,* 481 U.S. 551, 555, 107 S.Ct. 1990, 95 L.Ed.2d 539 (1987). There is no constitutional entitlement to counsel in discretionary appeals or in post-conviction collateral proceedings. *Id.* at 555. *Gunner v. Welch*, 3:09CV03009, 2013 WL 774154 (N.D. Ohio Feb. 28, 2013).

In *Coleman v. Thompson,* 501 U.S. 722, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991), the Supreme Court held that an attorney's ignorance or inadvertence in a post-conviction proceeding did not qualify as cause to excuse a procedural default. Braun argues that *Martinez v. Ryan*, 132 S. Ct. 1309, 182 L. Ed. 2d 272 (2012), modified the Court's holding in *Coleman* and that, "[b]ased on *Martinez*, the ineffectiveness of post-conviction counsel excuses Braun's claim from any procedural default."[19] Doc. 47, p.114. Braun is incorrect.

*Martinez* carved out only a limited exception to *Coleman*. It held that, "[w]here, under state law, ineffective assistance of trial counsel claims must be raised in an initial-review

---

[19] Braun asserts that his motion for new trial proceeding under Ohio Crim. R. 33 is a post-conviction proceeding. Doc. 47, p. 114. The Sixth Circuit found that "when a state defendant files a motion for new trial before filing a direct appeal, and when the denial of that motion is then consolidated with and reviewed during the direct appeal, the motion for new trial is part of the original criminal proceedings and is not a collateral proceeding." *Pudelski v. Wilson,* 576 F.3d 595, 610 (6th Cir.2009). Braun took his direct appeal prior to filing his motion for new trial and that appeal was not consolidated with or reviewed during his direct appeal. Doc. 47, p. 15. Accordingly, the Court reviews Braun's motion for new trial proceeding as a post-conviction proceeding.

collateral proceeding, a procedural default will not bar a federal habeas court from hearing those

claims if, in the initial-review collateral proceeding, there was no counsel or counsel in that

proceeding was ineffective." *Martinez v. Ryan*, 132 S. Ct. 1309, 1311, 1315-1320, 182 L. Ed. 2d

272 (2012). The Court defines "initial-review collateral proceedings" as collateral proceedings

which provide the first occasion to raise a claim of ineffective assistance of trial counsel.

*Martinez*, 132 S.Ct. at 1315. Justice Kennedy, writing for the Court, made clear that the

*Martinez* exception to *Coleman* is limited to claims of ineffective assistance *at trial.* In

discussing possible *stare decisis* objections to *Martinez,* Justice Kennedy wrote:

> "*Coleman* held that an attorney's negligence in a postconviction proceeding does not
> establish cause, and this remains true except as to initial-review collateral proceedings for
> claims of ineffective assistance of counsel *at trial.*"

132 S.Ct. at 1319 (emphasis added). The Supreme Court further emphasized:

> "The rule of *Coleman* governs in all but the limited circumstances recognized here. The
> holding in this case does not concern attorney errors in other kinds of proceedings,
> including appeals from initial-review collateral proceedings, second or successive
> collateral proceedings, and petitions for discretionary review in a State's appellate courts.
> It does not extend to attorney errors in any proceeding beyond the first occasion the State
> allows a prisoner to raise a claim of ineffective assistance at trial, even though that initial-
> review collateral proceeding may be deficient for other reasons. In addition, the limited
> nature of the qualification to *Coleman* adopted here reflects the importance of the right to
> the effective assistance of trial counsel…" (internal citations omitted).

*Martinez*, 131 S.Ct. at 1316

Under *Martinez*'s unambiguous holding, ineffective assistance of post-conviction counsel

cannot supply cause for procedural default of Braun's post-conviction due process claim. *Hodges*

*v. Colson*, 727 F.3d 517, 531 (6th Cir. 2013) ("We will assume that the Supreme Court meant

exactly what it wrote: '*Coleman* held that an attorney's negligence in a postconviction

proceeding does not establish cause, and this remains true *except* as to initial-review collateral

proceedings for claims of ineffective assistance of counsel *at trial.*' " *Hodges v. Colson*, 727

F.3d 517, 531 (6th Cir. 2013) (citing *Martinez*, 131 S.Ct. at 1316).  Accordingly, Braun's ineffective assistance of counsel claim cannot provide cause for his procedural default of Ground Six.  If a petitioner fails to show cause for his procedural default, the Court need not address the issue of prejudice. *See Smith v. Murray,* 477 U.S. 527, 106 S.Ct. 2661, 91 L.Ed.2d 434 (1986); *Elder v. Ohio*, 1:13CV1799, 2013 WL 6243509 (N.D. Ohio Dec. 3, 2013).  As Braun defaulted his claim of ineffective assistance of counsel, this Court is precluded from considering this issue as cause to excuse Petitioner's procedural default of his due process claim regarding his motion for new trial.[20] *See Edwards v. Carpenter*, 529 U.S. 446, 120 S. Ct. 1587, 146 L. Ed. 2d 518 (2000); *Jacobs v. Mohr*, 265 F.3d 407, 418 (6th Cir. 2001).

For all of the above reasons, Braun's ineffective assistance of counsel claim does not excuse his procedural default of Ground Six.

### 3. Braun's actual innocence claim does not excuse his procedural default

Braun also argues that, pursuant to *Schlup v. Delo*, 513 U.S. 298 (1995), his claim of actual innocence excuses his procedural default.  Doc. 47, p.106.  "[A] credible claim of actual innocence is extremely rare," S*ouler v. Jones,* 395 F.3d 577, 600 (6th Cir. 2005), and so "[t]he actual innocence exception should 'remain rare' and 'only be applied in the extraordinary case.'" *Id.* at 590 (quoting *Schlup v. Delo,* 513 U.S. 298, 321, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995)).  An "actual innocence claim…is not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits."  *Souler*, 395 F.3d at 588-89.

---

[20] In the alternative, Jaquith's performance was not deficient.  Braun admits and Jacquith's letter shows that his attorney informed him of his right and deadline to appeal to the Ohio Supreme Court in a timely matter, i.e., four days after the appellate opinion was issued.  Jaquith opined that Braun would not be successful either with an appeal to the Ohio Supreme Court or with a federal habeas petition.  However, Braun *pro se* filed his initial federal habeas petition with this Court on May 4, 2011, nineteen days before his memorandum in support of jurisdiction with the Ohio Supreme Court was due.  Accordingly, Braun cannot show either that counsel's performance was deficient or that the deficient performance prejudiced him.  *Strickland,* 466 U.S. at 686.

A petitioner's burden at the gateway stage is to demonstrate that, more likely than not, in light of the new evidence, no reasonable juror would find him guilty beyond a reasonable doubt—or, to remove the double negative, that more likely than not any reasonable juror would have reasonable doubt.  *House v. Bell*, 547 U.S. 518, 538, 126 S. Ct. 2064, 2077, 165 L. Ed. 2d 1 (2006).  The reviewing court must consider all evidence, old and new, and, based on the total record, make a "probabilistic determination about what reasonable, properly instructed jurors would do."  *Id.*  To proceed through the *Schlup* gateway a petitioner must present a "credible" claim of actual innocence. *Cleveland v. Bradshaw*, 693 F.3d 626, 633 (6th Cir. 2012).  This "requires petitioner to support his allegations of constitutional error with new reliable evidence— whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence that was not presented at trial." *Id.* (quoting *Schlup*, 513 U.S. at 324)

Considering all the evidence, old and new, more likely than not reasonable jurors would have found Braun guilty of murdering Chappell. Fitzer's recantation is not reliable based upon inconsistencies with Fitzer's own prior statements and based upon inconsistencies with the overall record, i.e., Fitzer previously told detectives on more than one occasion that Braun committed the murder of Chappell.  Doc. 12-3, pp. 11-12.

Recanting witnesses are viewed with extreme suspicion. *United States v. Willis,* 257 F.3d 636, 645 (6th Cir.2001); *United States v. Chambers,* 944 F.2d 1253, 1264 (6th Cir.1991), *superseded in part on other grounds by* U.S.S.G. § 2D1.5(a). Furthermore, the appellate court found Fitzer's recantation

> "…did not provide credible evidence to warrant a new trial for Braun. Fitzer had nothing to lose by recanting his statement—he is serving what amounts to a life sentence and has exhausted his state appeals. Further, other evidence presented at Braun's trial did not support Fitzer's new claims. For example, cell phone records showing numerous calls from Shear to the victim on the day and evening of the murder were admitted into

evidence at trial, which corroborated other trial testimony that Shear and Braun murdered
Chappell."

Doc. 12-1, Ex. 44, p. 463.

Additional corroborating testimony supports that Braun murdered Chappell.  Shannon
Holbert testified that Braun admitted to killing Chappell. Doc. 12-1, Ex. 29, pp. 211-234, ¶ 8.
Michael Graham testified that Braun admitted to the murder of Chappell. Id., ¶17.  Kimberly
Ferline, Braun's ex-girlfriend, testified that Braun asked her to be his alibi for the night of
Chappell's murder and asked her to find his gun and throw it in the lake.  Id., ¶¶ 25-26.  Ferline
testified that, when she didn't find the gun, Braun said that Shear must've gotten it.  Id., ¶26.
Matthew Stedman's testified that Braun told him that he killed Chappell and that he set up an
alibi for the murder.  Id., ¶36-37.  Stedman also testified that Braun asked him to help draft a
motion to marry Ferline so that she could not testify against him at trial.  Id., ¶ 40.  Braun's
testimony at trial confirmed that he requested Stedman's help with the motion but denied that he
wanted to marry Ferline so she could not testify against him.  Doc. 12-2, pp. 2551-2553.  Tom
McDonald, a drug dealer, testified that Braun and Fitzer robbed him four days after the Chappell
murder.  McDonald further testified that Braun hit him over the head with a golf club and Roy
Fitzer shot him three times.  Id., ¶44.  Braun testified that he carried a .380 automatic gun and,
around the time of the murder, he and John Shear were robbing drug dealers.  Doc. 12-2, Tr.
2389-2391.

Based on all of the above evidence it is more likely than not that reasonable jurors would
have found Braun guilty of murdering Chappell despite Fitzer's recantation.  Accordingly, Braun
fails to present a credible claim of actual innocence.  As such, this Court should not reach the
merits of Ground Six.

### 4. Cognizability and merits not reached

Even if the Court were to consider the merits of Ground Six, it is unlikely that Braun would succeed on the merits for the reasons discussed below.

First, Braun's Sixth Ground challenging the correctness of the trial court's denial of his motion for a new trial is not a cognizable federal habeas claim. *See Pudelski v. Wilson,* 576 F.3d 595, 610–11 (6th Cir.2009). Federal habeas corpus is only available to correct violations of federal law. 28 U.S.C. § 2254(a). "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Estelle v. McGuire,* 502 U.S. 62, 67–68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991). Accordingly, this Court cannot review this claim to the extent it is premised on state law but it can review this claim for constitutional error, i.e., whether the denial of Braun's motion amounted to a violation of his federal due process rights. *Pudelski,* 576 F.3d at 611; *Rodriguez v. Warden, S. Ohio Corr. Facility*, 940 F. Supp. 2d 704, 711 (S.D. Ohio 2013).

As to the merits, Braun argues that Fitzer's admission to the murder, i.e., actual innocence claim, as well as the state's presentation of false and misleading statements at trial denied him due process.   With regard to actual innocence as a violation of due process, as previously stated, an "actual innocence claim…is not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." *Souler*, 395 F.3d at 588-89.

With regard to Braun's false and misleading testimony claim, he would have to prove that the prosecutor's failure to correct false testimony violated his due process rights.  He would have to demonstrate that: (1) the statement was actually false; (2) the statement was material; and (3) the prosecution knew it was false and that the information had a "reasonable likelihood" to

"[affect] the judgment of the jury."  *Rosencrantz v. Lafler,* 568 F.3d 577, 583–84 (6th Cir.2009).

*Wogenstahl v. Mitchell*, 668 F.3d 307, 323 (6th Cir. 2012). Braun identifies five statements made

at trial which he alleges were false and misleading.

First Braun argues that the state prosecutor represented that Fitzer was a co-conspirator.

Doc. 47, p. 123. This statement does not support Braun's argument that the prosecutor presented

false and misleading testimony which violated his due process rights.  The statement cannot meet

the *Rosencrantz* standard because the statement was made in arguing an oral motion to the Court

prior to trial outside the presence of the jury.  Doc. 12-2, p. 592-594.  It is not possible a

statement made outside the presence of a jury had a reasonable likelihood of affecting the

judgment of the jury.  Therefore, the statement did not violate Braun's due process rights.

The next statement Braun argues was false and misleading was a statement by the

prosecutor that, "Fitzer…is a co-conspirator indicating his willingness since the time of these

acts since he gave information that spearheaded this investigation…And at this point Roy Fitzer

has not turned his back on the side of the defense."  Doc. 47, p. 123.  As with the previous

statement, this statement was made in argument on oral motion to the Court prior to trial outside

the presence of the jury.  Doc. 12-2, p. 592-594.  Accordingly, it could not have been reasonably

likely to affect the judgment of the jury.  Therefore, the statement did not violate Braun's due

process rights. Moreover, Braun misquotes the prosecutor's statement.  The prosecutor actually

stated,

> "…Fitzer, who is a co-conspirator indicating his willingness since the time of these acts
> since he gave information that spearheaded this investigation, of his commitment --
> letters that I have turned over to the defense -- his commitment to come in and *exonerate*
> these individuals[21] from this crime, and keeping in mind that Roy Fitzer is an integral co-
> defendant or integral co-conspirator in this as he was involved with Jeffrey Braun on the
> night of the crime in this particular case, and more importantly, thought the day

---

[21] "[T]hese individuals" was referring to Braun and Braun's co-defendant Shear.  Doc. 12-2, pp. 594-595.

surrounding the crime where they teamed up and robbed and burglarized Tom McDonald and shot him.  And at this point Roy Fitzer has now *turned back on the side of the defense* as exhibited in his written letters to exonerate these individuals."[22]

Doc. 12-2, pp. 594-595.  (Emphasis added).

Next, Braun argues that a witness for the state represented that Fitzer proffered against Braun and that Fitzer would be presented as a witness to inculpate Braun.  Doc. 47. With regard to the statement that Fitzer proffered against Braun, Detective Veverka testified that Roy Fitzer proffered a statement for the State, but did not testify as to the details of that statement.  Doc. 12-2, p. 1911.  Fitzer's affidavit confirms that he made a statement for the State.  Doc. 12-1, Ex. 34, p. 376.  Accordingly, Braun cannot show that Detective Veverka's statement was false or that the statement violated due process.

Braun further argues that Detective Ververka represented that Fitzer admitted to having gotten a gun from Braun used in the murder.  Doc. 47, p. 123.  A review of the record reveals Veverka stated that Braun told Veverka that he made a motion for discovery because he saw a statement Fitzer had given stating that Braun had given him a gun used in a murder.  Doc. 12-2, p. 1915.  Veverka, therefore, did not represent what Fitzer stated, only what Braun told him. Braun does not argue that his own statement was false.

Finally, Braun identifies as false the prosecutor's representations during the state's opening statement that Fitzer was a co-conspirator and that Fitzer would be presented as a witness.  The trial judge instructed the jury that opening statements are not evidence (Doc. 12-2, pp. 1043-44) and it must be presumed that the jury followed that instruction.  A jury is presumed to follow instructions given by the court. *Weeks v. Angelone*, 528 U.S. 225, 234, 120 S. Ct. 727,

---

[22] At the time of Braun's trial Fitzer recanted his statements, that Braun was Chappell's killer, but did not admit responsibility for the killing until after the trial.  Doc. 12-3, p. 12.

733, 145 L. Ed. 2d 727 (2000); *Richardson v. Marsh,* 481 U.S. 200, 211, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987).  Accordingly, these statements do not violate Braun's due process rights.

Although the Court should not reach the merits, for the reasons state above, Braun would not succeed on a merits argument.

## V. Conclusion and Recommendation

For the reasons stated above, Braun's Grounds for Relief are procedurally defaulted and are without merit.  Accordingly, the undersigned recommends that Braun's Amended Petition for writ of habeas corpus (Doc. 47) be **DENIED**.

Dated: December 13, 2013

Kathleen B. Burke
United States Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); s*ee also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).